HIATT GRAIN & FEED, INC., on behalf of itself and all others similarly situated, Plaintiff,

v.

Hon. Bob BERGLAND, Secretary of Agriculture, United States of America, Defendant,

Ralph Ball, Benjamin Duell, Ray Madden, Kaye Morison, Godfrey Strasburg, Bill Turrentine, Maurice Foster, Gregory Blick, Stanley Schmitt, Robert Bowman, Howard A. Young, Larry Yost, Leo Paulsen, Andy Plett and Dwight A. Klinger, and Farmers Cooperative Union of Sterling, Kansas, an agricultural cooperative, and Far-Mar-Co., Inc., an agricultural cooperative, Intervenors.

No. 77–4161.

United States District Court,
D. Kansas.

Jan. 18, 1978.

458

William H. Curtis, P. John Owen, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., John Q. Royce, Tom W. Hampton, Hampton, Royce, Engleman & Nelson, Salina, Kan., for plaintiff.

James P. Buchele, U. S. Atty., D. Kan., Topeka, Kan., Griffin B. Bell, Atty. Gen., Washington, D. C., Barbara Allen Babcock, Asst. Atty. Gen., Dennis G. Linder, William Z. Elliott, Dept. of Justice, Washington, D. C., Mary K. Briscoe, Asst. U. S. Atty., Topeka, Kan., for defendant.

Robert L. Gowdy, Kansas City, Mo., for Ralph Ball, Duell, Madden Morrison, Strasburg, Turrentine, Foster, Blick, Schmitt, Bowman, Young, Yost, Paulsen, Plett, Klinger, Farmers Cooperative Union of Sterling, Ks. and Far-Mar-Co., Inc.

Leonard O. Thomas, Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., Donald E. Graham, Washington, D. C., for National Council of Farmer Cooperatives.

Charles D. McAtee, Topeka, Kan., for National Council et al.

ROGERS, District Judge.

## I. INTRODUCTION

On July 14, and August 9, 1977, the Secretary of Agriculture, Bob Bergland, published amendments to 7 C.F.R. §§ 1421 and 1425. 42 Fed.Reg. 36234, *et seq.*, and 40175,

*et seq.* (1977). The basic purpose of the amendments was to add barley, corn, grain sorghum, oats, rye, and wheat to the list of commodities for which approved cooperative marketing associations may obtain price support loans (referred to in this litigation as "Form G" loans) for their producer-members. The final publication of the amendments occurred on August 9, 1977, 42 Fed.Reg. 40175–40188. (PX # 10). By this action, filed on August 9, 1977, plaintiff Hiatt Grain & Feed, Inc., on behalf of itself and all others similarly situated, challenged the promulgation and implementation of the amended regulations.

By order of September 1, 1977, this litigation was certified as appropriate for class action treatment pursuant to F.R.Civ.P. 23, 28 U.S.C. The plaintiff class is composed of grain dealers (hereinafter referred to as "independents" or "privates") which are not cooperative organizations. The scope of the class was described in the certification order as follows:

> The scope of the class should cover that group defined by plaintiff in its complaint, that is, all persons, firms, partnerships, corporations, and other business entities who own or operate facilities for the storage, purchase, sale, handling, processing, merchandising, or marketing of barley, corn, grain sorghum, oats, rye, and wheat, or any one or more of said commodities, but who do not and cannot meet the eligibility requirements to participate in the price support program under the regulations issued by the Secretary of Agriculture, and who are not cooperative marketing associations.

The interest of the plaintiff class of independent or private grain dealers is counterpointed by the intervenors, who were allowed to intervene in this action by order of September 6, 1977. The intervenors represent the interests of the cooperative grain dealers of the United States. The intervenors are a regional cooperative (FAR-MAR-CO), a local cooperative (Farmer's Cooperative Union of Sterling, Kansas), and several individual wheat growers.

A motion for a temporary restraining order was filed along with the complaint. By agreement of the parties, a temporary restraining order was entered and remained effective until September 9, 1977, when this Court, after two days of hearings, entered an order denying plaintiff's motion for a preliminary injunction. The order expressed no opinion on the merits of the litigation, but denied preliminary relief upon the grounds that plaintiff had failed to prove that immediate irreparable injury would result to the class in the absence of such relief. Despite the Court's dissolution of the temporary restraining order, it is our information that defendant has voluntarily refrained from fully implementing the challenged regulations pending the resolution of this case. (Robbins Depo., p. 11)

A trial on the merits of this action was held November 7–14, 1977. All post-trial memoranda were submitted by the parties by January 6, 1978.

A brief factual background concerning the case was contained in the order denying the motion for a preliminary injunction. We shall now restate that factual summary, with some alteration.

A price support loan works generally like this: When a farmer delivers his grain to an elevator (private or cooperative), he may wish to sell it at that time. If he does not, he will store it with the elevator pending his decision to sell. If the farmer is not ready to sell, but needs money to carry on his farming operation, he may as one option take out a government price support loan. This involves paying advance storage charges to the elevator, receiving a receipt for the grain, and obtaining the price support loan from the county A.S.C.S. office. The loan is non-recourse and the present interest rate is 6%. If the price of the grain is significantly higher than the price support level (presently about $2.25/bushel for wheat), there is less reason to obtain such a loan than if the price of wheat is near or below the loan rate. If a loan is taken out while the price of wheat is near the loan rate, then the farmer may sell the wheat and use the proceeds to pay off the loan.

However, if the price of wheat does not go up, the farmer may fare better by keeping the proceeds of the loan and allowing the government to "takeover" the grain. This is the farmer's option and illustrates the non-recourse nature of the loan. Only if the farmer elects to sell the wheat and pay off the loan need he pay the interest charge.

Price support loans to farmers are administered by the Commodity Credit Corporation (C.C.C.), and the Agricultural Stabilization and Conservation Service (A.S.C.S.). Both the C.C.C. and the A.S.C.S. are under the general supervision of defendant Bergland in his capacity as Secretary of the United States Department of Agriculture (U.S.D.A.). As early as the 1930's, price supports for cotton were administered through cooperative marketing associations to their producer-members. Over the years, the list of crops for which cooperatives could receive (and pass on to their producer-members) price support loans was expanded by various Secretaries of Agriculture to include such commodities as rice, honey, soybeans, tung oil, and dry edible beans.

By the challenged regulations, defendant seeks to expand the list of crops for which approved cooperatives may receive (and pass on to their producer-members) price support loans to include barley, corn, grain sorghum, oats, rye, and wheat. Insofar as the interests of the parties before the Court are concerned, wheat is the crop which is of immediate and primary concern. Plaintiff's concern is prompted largely by the formation of a marketing program by intervenor FAR-MAR-CO. In the 1976 crop year FAR-MAR-CO initiated a marketing program called Pro-Mark, which was designed to allow FAR-MAR-CO, a large regional cooperative, to effectively enter the field of exporting grain (traditionally dominated by non-cooperative multinational corporations) by utilization of large "pools" of grain which would be supplied by producer-members.

The concept of pooling is defined in PX # 28, a treatise by the Department of Agriculture entitled Improving the Export Capability of Grain Cooperatives, p. 40 (1976):

Another method by which producers commit grain to local elevators is through *pooling*. This method is unique to cooperatives. Under such an arrangement, each producer commits a specified volume or acreage to the cooperative. He receives a cash advance at harvest, progress payments as the grain is sold, and a final payment once the pool is liquidated. The total of all payments equals the average price received by the cooperative for grain sold out of the pool, less cost of pool operation. Adjustments are made for quality differences.

This description fairly applies to FAR-MAR-CO's Pro-Mark program, under which farmer-producers voluntarily commit large amounts of grain to the local cooperatives, and ultimately FAR-MAR-CO. The producer-members voluntarily surrender the marketing decision to the co-op. Armed with a large pool of grain, FAR-MAR-CO endeavors to enter the grain export market and receive optimum prices for the producers who had committed their grain. In 1976, FAR-MAR-CO, through the Pro-Mark program, obtained a pool of about 33 million bushels of wheat. By October 31, 1976, producer-members of cooperatives had committed to the Pro-Mark program 1977 crops which, after harvest, approximated 38 million bushels.

Until fairly recently, price support loans were pegged at about $1.25 a bushel, while wheat prices were significantly higher. Therefore, farmers who committed part or all of their wheat crop to Pro-Mark were not disadvantaged by the fact that such an action rendered them ineligible to receive price support loans. However, at the time defendant initiated the process of promulgating the challenged regulations, the support loan price had been raised to around $2.25 per bushel while the market price of wheat had plummetted to a level at or below °the support price. Therefore, a farmer who committed his crop to the Pro-Mark program could very well have been (in the absence of the challenged regulations) at a marketing disadvantage. Thus,

under the former regulations a farmer who did not commit his crop to Pro-Mark, but retained the marketing decision while selling through either a private grain-dealer or a cooperative, could obtain a price support loan. However, a farmer who committed his crop to Pro-Mark could not obtain the benefits of such a loan.

The defendant promulgated the new regulations purportedly as part of a series of steps designed to boost the farm sector of the economy, and for the specific reason of eliminating perceived discrimination existent in prior farm support regulations. (Tr. 768, 770)

The plaintiff class, as explained above, is composed of independent grain marketing companies that compete with cooperatives for the right to buy or store the grain produced by farmers. Most of the plaintiff class members operate so-called "country elevators." The plaintiff's motivation in bringing this lawsuit stems from the fear that the promulgation and implementation of the regulations in question will grant a large competitive advantage to the cooperative marketing associations and will result in serious economic injury to the plaintiff class.

Plaintiff has unleased a barrage of attacks upon the proposed amendments to 7 C.F.R. §§ 1421 and 1425. The pretrial order contains a summary of these attacks. Prior to trial, the Court formulated six major issues in order to properly focus the attention of the parties during the trial. Those six issues, condensed from the allegations of the parties, were:

1. DOES THE PLAINTIFF HAVE STANDING TO CHALLENGE THE PROMULGATION AND IMPLEMENTATION OF THESE REGULATIONS?

2. WERE THE CHALLENGED REGULATIONS ISSUED WITHOUT AUTHORITY OF LAW?

3. WAS THE PROMULGATION OF THE REGULATIONS "ARBITRARY AND CAPRICIOUS"?

4. ARE THE REGULATIONS INVALID BECAUSE OF DEFENDANT'S FAILURE TO FILE AN ENVIRONMENTAL IMPACT STATEMENT?

5. ARE THE REGULATIONS INVALID BECAUSE OF DEFENDANT'S FILING OF AN ALLEGEDLY INADEQUATE ECONOMIC IMPACT STATEMENT?

6. ARE THE REGULATIONS INVALID BECAUSE THEY PROMOTE VIOLATIONS OF
 a) the Commodity Exchange Act;
 b) the Sherman Act and the Capper-Volstead Act; and
 c) 15 U.S.C. § 713a–13?

To these six major issues, we now add a seventh:

7. ARE THE REGULATIONS UNCONSTITUTIONAL BECAUSE THEY DEPRIVE THE PLAINTIFF CLASS OF DUE PROCESS AND EQUAL PROTECTION?

Before addressing these seven major issues, the Court must first turn its attention to a post-trial motion to strike filed by intervenors.

## II. MOTION TO STRIKE

After the trial of this case, intervenors filed a "Motion to Strike", requesting that the Court strike from the record some of the exhibits and all of the testimony presented by plaintiff at the trial of this action. This motion is prompted by intervenors' fears that the Court intends to try this action *de novo*, rather than utilizing appropriate standards of judicial review of an administrative action.

At the time of its rulings, the Court was aware of the consternation caused to defendant and intervenors by the consistent admission of testimony outside the administrative record. While the Court did not intend to try the action *de novo*, a liberal policy as to admission of evidence was consciously followed. The Court admitted the evidence proffered by plaintiff (and by defendant and intervenors in response) in an abundance of caution in this very complicated case.

The Court felt that the liberal admission of evidence would be helpful for three reasons in particular. First, the extensive testimony and numerous exhibits presented by the parties, while transcending the administrative record, aided the Court's understanding of the complex and technical issues of this case. Because of the evidence presented which was outside the administrative record, the Court is now in a much better position to understand and evaluate the evidence which *was* contained in the administrative record.

Second, the evidence admitted was deemed by the Court to be essential to effective resolution of the question of whether defendant should have filed an environmental impact statement. The issues surrounding plaintiff's contention in this regard are not purely legal in nature. As shall be explained in our N.E.P.A. discussion, the testimony submitted was helpful to resolution of this most difficult question.

Third, the Court felt that the evidence which was allowed into the record provided assistance in the determination of the adequacy of the administrative record. In some cases, it might be very easy for a court, in a vacuum, to determine the adequacy of an administrative record. That is not the situation in this complex case. The Court, in reviewing the action, must determine whether all relevant factors were considered. *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 238 (8th Cir. 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). How is the Court to determine whether all relevant factors were considered in the administrative record without knowing what factors outside the administrative record were not considered in the decisionmaking process? Without desiring to hold a *de novo* review, the Court wished to fully assure itself that the administrative record upon which defendant's decision was based was adequate.

For reasons which shall be explained *infra,* the Court deems the administrative record in this case to be adequate. Given this finding, *de novo* review of the issues is inappropriate; defendant's action must be

judged in light of the administrative record. Therefore, the intervenors' motion to strike is granted, and all challenged evidence is stricken, except to the following extent:

1) all information admitted shall be allowed to remain in the record to the extent that it merely serves the purpose of assisting the Court to understand the complex issues presented;

2) all evidence relevant to the determination of the environmental impact statement issue shall remain in the record and be considered for that purpose;

3) all information admitted shall be allowed to remain in the record for the limited purpose of allowing the Court to determine the adequacy of the administrative record; and

4) testimony of U.S.D.A. officials which is merely explanatory of the administrative record shall be considered for that limited purpose.

To repeat, we find the administrative record upon which this decision was based to be adequate. We have no intention of trying this action *de novo.* Admittedly, the Court treads a thin line when it endeavors to evaluate evidence outside the administrative record for purposes of determining the adequacy of the administrative record, while at the same time attempting to exclude that evidence while reviewing the substantive decision based upon the administrative record. This Court has tried mightily to appreciate and follow the distinction.

## III. DISCUSSION OF MAJOR ISSUES

1. DOES THE PLAINTIFF HAVE STANDING TO CHALLENGE THE PROMULGATION AND IMPLEMENTATION OF THESE REGULATIONS?

It is the position of the intervenors that the plaintiff does not have standing to challenge the promulgation and implementation of the questioned regulations. Intervenors introduce their argument by setting forth the two major standing requirements. First, plaintiff must allege "injury in fact";

second, plaintiff must allege injury to an interest "arguably within the zone of interests to be protected" by the statutory framework under which the claim arises. *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

Intervenors offer a bifurcated argument to reflect the two elements of the standing test set forth in *Data Processing,* and we shall organize our discussion along the same lines.

## A) INJURY IN FACT

█ Intervenors argue that plaintiff does not have standing to bring this action because it does not meet the "injury in fact" portion of the *Data Processing* test for standing. Intervenors first argue that plaintiff does not meet this test because its analysis of the merits of the dispute is inaccurate and when an accurate analysis is made it can be determined that plaintiff will not be injured by the implementation of the challenged regulations. What intervenors argue, in essence, is that plaintiff cannot prove the merits of its claim. While plaintiff may be required to do more than merely allege standing, plaintiff should not be required to prove the merits of its claim before standing is granted. *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1360 n. 6 (5th Cir. 1976), *cert. denied* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).

In arguing the merits of plaintiffs' claim that a statutory violation exists, defendant has exceeded the scope of the inquiry raised by a standing challenge. Standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The relevant inquiry is whether plaintiffs have alleged an actual or threatened injury to themselves that is likely to be redressed by a favorable decision. *Simon v. Eastern Ky. Welfare*

*Rights Organization,* 426 U.S. 2637–39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). They need not show that the decision will be in their favor . . . To require otherwise would force plaintiffs to establish the validity of their claim for relief as a prerequisite to invoking federal jurisdiction. [*American Medical Ass'n v. Mathews,* 429 F.Supp. 1179, 1189 (N.D.Ill. 1977)]

Intervenors then argue that because the nature of the injury which plaintiff has alleged is economic, it is insufficient to confer standing. Intervenors rely upon a trilogy of cases which held that businesses which are injured by the government's action in aiding a competitor do not have standing "unless the right invaded is a legal right". *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); *Tennessee Electric Power Co. v. T. V. A.,* 306 U.S. 118, 140, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939); *Alabama Power Co. v. Ickes,* 302 U.S. 464, 479, 58 S.Ct. 300, 82 L.Ed. 374 (1938). The essence of this "legal interest" test is summed up in syllabus # 3 of the *Tennessee Electric* opinion:

3. The validity of a statutory grant of power can not be challenged merely because its exercise results in harmful competition. The damage is *damnum absque injuria.*

█ Intervenors conveniently overlook the fact that the "legal interest" requirement for standing was rejected in *Data Processing,* when Justice Douglas noted:

The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. [397 U.S. at 153, 90 S.Ct. at 830]

Thus, by alleging competitive economic injury, plaintiff has adequately satisfied the requirement of "injury in fact". *Rental Housing Ass'n of Greater Lynn v. Hills,* 548 F.2d 388, 390 (1st Cir. 1977). When interve-

nors cite the opinions in *Alabama Power, Tennessee Electric,* and *Lukens Steel,* relating to "legal interest", they misanalyze the "injury in fact" requirement.

The Supreme Court has itself several times noted the liberalizing effect upon the standing requirement that *Data Processing* wrought:

> Recent decisions by this Court have greatly expanded the types of "personal stake[s]" which are capable of conferring standing on a potential plaintiff. Compare *Tennessee Electric Power Co. v. TVA,* 306 U.S. 118 [59 S.Ct. 366, 83 L:Ed. 543] (1939), and *Alabama Power Co. v. Ickes,* 302 U.S. 464 [58 S.Ct. 300, 82 L.Ed. 374] (1938), with *Barlow v. Collins,* 397 U.S. 159 [90 S.Ct. 832, 25 L.Ed.2d 192] (1970), and *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150 [90 S.Ct. 827, 25 L.Ed.2d 184] (1970). [*Linda R. S. v. Richard D.,* 410 U.S. 614, 616–617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)]

*See also United States v. Richardson,* 418 U.S. 166, 193–194, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring); *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Investment Co. Institute v. Camp,* 401 U.S. 617, 620–621, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1974); *Arnold Tours v. Camp,* 400 U.S. 45, 46, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 6, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); *Wells Fargo Armored Serv. v. Ga. Public Service Com'n.,* 547 F.2d 938, 940 n. 2 (5th Cir. 1977); *In re Harwald Company,* 497 F.2d 443, 444 (7th Cir. 1974); *Evans v. Lynn,* 537 F.2d 571, 610 (2d Cir. 1975) (Kauffman, J., dissenting); *duPont v. Woodlawn Trustees, Inc.,* 64 F.R.D. 16, 21 n. 4 (D.Del.1974).

### B) ZONE OF INTEREST

The second facet of intervenors' standing argument is their contention that plaintiff. does not allege an injury which falls within the "zone of interests" arguably protected by the statutory framework under which the claims are brought.

We believe that the "zone of interest" test as it relates to the environmental im-

pact statement and economic impact statement issues deserves special treatment, and we shall address standing separately as we address those two issues.

■ As to plaintiff's coming within the "zone of interests" protected by the various agricultural acts, the commodities acts, the antitrust acts, and the Administrative Procedure Act, we conclude that plaintiff has met this requirement. Without going into detail, we simply conclude that plaintiff has interests which, although perhaps not primary, are nonetheless protected under these enactments. Without abandoning the "zone of interests" requirement, we refrain from applying it stringently in light of Professor Davis' observation that in its latest eighteen majority opinions addressing the standing issue the Supreme Court has failed to mention this factor. K. Davis, *Standing, 1976,* 72 N.W.U.L.Rev. 69, 81 (1976); *see also Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). We do not think that intervenors' argument as to plaintiff's alleged lack of standing under these statutes overcomes the presumption of standing. *Peoples v. United States Department of Agriculture,* 138 U.S.App.D.C. 291, 427 F.2d 561, 563 (1970). Nor may we ignore plaintiff's constitutional claims which may not be defeated by resort to the standing doctrine. *Chicano Police Officer's Ass'n. v. Stover,* 526 F.2d 431, 436 (10th Cir. 1975), *vacated on other grounds,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

As noted, we shall discuss standing again as a separate matter when we address the environmental impact statement and economic impact statement issues. As to the other issues presented, we find standing and shall proceed to the merits presented.

### 2. WERE THE CHALLENGED REGULATIONS ISSUED WITHOUT AUTHORITY OF LAW?

One of the most serious contentions raised by plaintiff is the argument that the challenged regulations were issued without authority of law. Plaintiff's argument, in capsulized form, runs like this:

The Secretary's decision is unlawful. Only a "producer" may receive price support assistance. A cooperative marketing association can not qualify. Accordingly, the Secretary's decision exceeds his statutory authority and abuses the administrative discretion committed to him. [Suggestions in Support of Plaintiff's Motion For a Preliminary Injunction, p. 25]

Remembering that a regulation is presumed to be valid unless it is shown by those attacking it to be contrary to law [*Forest v. Consumer Product Safety Com'n.*, 559 F.2d 774, 783 (D.C. Cir. 1977); *State of Florida v. Mathews*, 526 F.2d 319, 323 (5th Cir. 1976)], and that the construction given an act by the agency in charge of its administration should be given persuasive effect [*Ballard E. Spencer Trust, Inc. v. Morton*, 544 F.2d 1067, 1070 (10th Cir. 1976); *Clarkson Const. Co. v. Occupation Safety and Health Review Comm'n.*, 531 F.2d 451, 457 (10th Cir. 1976); *Alexander v. Richardson*, 451 F.2d 1185, 1187 (10th Cir. 1971), *cert. denied*, 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972)], we begin our analysis of plaintiff's argument.

Plaintiff's argument has essentially three steps. First, plaintiff points out that the Secretary's authority to provide price support loans springs, at least in part, from 7 U.S.C. § 1441, which states that under certain conditions,

The Secretary of Agriculture . . . is authorized and directed to make available through loans, purchases, or other operations, price support to *cooperators* for any crop of any basic agricultural commodity . . . (emphasis added)

Second, plaintiff notes that the term "cooperator" is defined in 7 U.S.C. § 1428(b) as a "*producer* on whose farm the acreage planted to the commodity does not exceed the farm acreage allotment . . ." (emphasis added)

After noting that price support assistance is to go to "cooperators" who are defined as "producers", plaintiff points finally to various definitions of the term producer, such as that contained in 7 C.F.R. § 719.2(s):

Person who as owner, landlord, tenant or sharecropper, is entitled to share in the crops available for marketing from the farm or in the proceeds thereof.

From these three observations, plaintiff concludes that because cooperatives are not landlords, tenants, owners, or sharecroppers, they cannot be given price support loans. Therefore, plaintiff argues that the Secretary has exceeded his congressionally-authorized authority.

Extension of price support loans to cooperatives, plaintiff further argues, violates the congressional intent involved with the passage of the agricultural acts. Plaintiff argues that the legislative history behind the passage of the Agricultural Act of 1948, P.L.No. 897, 62 Stat. 1247 (1948) clearly "reveals that farmers, nor cooperatives, were the objects of congressional concern." [Suggestions in Support of Plaintiff's Motion for a Preliminary Injunction, p. 30]

The keystone of plaintiff's argument is the contention that cooperatives are not "producers". Numerous definitions from cases and regulations are tirelessly cited throughout plaintiff's briefs on this issue. Unfortunately, plaintiff's main focus misses the thrust of the defendant's position. Defendant and intervenors do not contend that cooperatives are "producers". Rather, they argue that the challenged regulations contemplate not loans *to* cooperatives for their own benefit, but loans to the producer-members of cooperatives *through* the cooperatives.

In regard to defendant's theory, the nature of the general eligibility regulations [7 C.F.R. § 1425 Fed.Reg., 7/14/77)] is important in at least two respects. First, the regulations assure that cooperatives are closely controlled by and identified with their producer-members. We reject plaintiff's argument that cooperatives are merely a form of corporate organization with no special relationship between the members and the cooperative.

It should not be assumed that the members or stockholders of a cooperative, except in a technical legal sense, are separate and apart from the association.

*The members are the association,* and the officers and directors of the association are, from a practical point of view, simply their agents for the conduct of the joint enterprise. The officers and directors are placed in office and continue there only through the action or acquiescence of the stockholders or members. In other words, the stockholders or members are essentially the principal or the "employer," and the officers and directors are simply their "employees" or agents to direct the business; the agents are subject to the control of their employers. [U.S.D.A., Legal Phases of Cooperatives 12 (1976)] (emphasis added)

The eligibility regulations aim to assure this close relationship between a cooperative and its members. 7 C.F.R. § 1425.4, 42 (Fed.Reg. 36235 (7/14/77) states:

> The cooperative shall be owned and controlled by its active producer members and any bona fide cooperative members
>
> . . .

The regulations specify that members of the cooperative must own over 50% of its stock. More than 50% of the members of a cooperative must be active producers [7 C.F.R. § 1425.4, 42 Fed.Reg. 36325 (7/14/77)], and to be approved for Form G loans a cooperative must follow regulations as to annual meetings, nominations, secret ballots, proxies, financial statements and other requirements aimed at assuring that the cooperative is actually controlled by its producer-members. 7 C.F.R. § 1425.5, 42 Fed.Reg. 36236 (7/14/77). If price support is sought for a given crop, 80% of the crop that is acquired by the co-op for marketing must be produced by members. 7 C.F.R. § 1425.11, 42 Fed.Reg. 36237 (7/14/77). Similar provisions govern the control of regional co-ops by their member cooperatives.

A second important aspect of the eligibility regulations is the "pass-through" requirement which assures that the financial benefit of the price support loan accrues to the producer-members, and not to the cooperative as an entity. § 1425.14 of the recently amended regulations governs distribution:

> (a) *Loan advances.* If price support is obtained from CCC on any part of the commodity in a pool, the loan proceeds *shall be distributed to members* participating in such pool on the basis of the quantity and quality of the commodity delivered by each member less any authorized charges for services performed by and/or paid for by the cooperative which are necessary to condition the commodity or otherwise make the commodity eligible for loan. [42 Fed.Reg. 36238 (7/14/77)] (emphasis added)

The evidence before the Court indicated that such pass-through would probably occur within 10 days after the producer delivered the commodity to the cooperative. (P.I. Tr. 199–200) Regulations are presently under consideration which would mandate that such pass-through occur within 15 days. 49 Fed.Reg. 54566 (10/7/77)

The distinction between loans "to" cooperatives and loans "through" cooperatives obliterates the basis of plaintiff's argument, yet plaintiff's briefs do little other than label the distinction "sophistic." We disagree.

7 U.S.C. § 1441(a) authorizes and directs the Secretary of Agriculture to "make available" price supports in various forms to cooperators. The statute contains no limitations on the methods the Secretary is to use in carrying out this mandate. The use of co-ops as fiscal conduits channeling the loan from the government to the producer is just one of the methods used by the Secretary.

7 U.S.C. § 1421 also contains a grant of authority to defendant:

> (a) The Secretary shall provide the price support authorized or required herein through the Commodity Credit Corporation *and other means available to him.*
>
> (b) Except as otherwise provided in this Act, the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out, shall be determined or approved by the Secretary. (emphasis added)

**472**

The Secretary has traditionally used co-ops as one of the "other means" for providing price support.

The Secretary has utilized the C.C.C. for supervision of price support. Its powers are contained in 15 U.S.C. § 714b, and are very broad in nature. That statute provides that the C.C.C.:

(d) May adopt, amend, and repeal by-laws, rules, and regulations governing the manner in which its business may be conducted and the powers vested in it may be exercised.

. . . . .

(j) Shall determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid.

. . . . .

(*l*) May make such loans and advances of its funds as are necessary in the conduct of its business.

Another statute which must be considered is 15 U.S.C. § 714j, which states:

The Corporation [C.C.C.] may, in the conduct of its business, utilize on a contract or fee basis, committees or associations of producers, producer-owned and producer-controlled cooperative associations, and trade facilities.

Now we frankly admit that we wish for a statute which would more explicitly have provided for the action the Secretary has taken here. However, we must recognize the broad nature of the powers which the Secretary has, and the reason for those broad powers—that the legislature must leave administrative flexibility to allow an agency to meet new contingencies. In *American Trucking Assns. v. United States,* 344 U.S. 298, 309–310, 73 S.Ct. 307, 314, 97 L.Ed. 337 (1953), the Supreme Court wrote:

Here, appellants have framed their position as a broadside attack on the Commission's asserted power. All urge upon us the fact that nowhere in the Act is there an express delegation of power to control, regulate or affect leasing practices, and it is further insisted that in each separate provision of the Act grant-

ing regulatory authority there is no direct implication of such power. Our function, however, does not stop with a section-by-section search for the phrase "regulation of leasing practices" among the literal words of the statutory provisions. As a matter of principle, we might agree with appellants' contentions if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or ·do include specific consideration of every evil sought to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. *National Broadcasting Co. v. United States,* 319 U.S. 190, 219–220, 63 S.Ct. 997, 87 L.Ed. 1344; *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 193–194, 61 S.Ct. 845. Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess. *United States v. Pennsylvania R. Co.,* 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499.

*See also Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 372, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *State of Florida v. Mathews, supra,* 526 F.2d at 324.

■ The statutes granting authority to the Secretary of Agriculture and the C.C.C. in this realm are not unambiguous. They must be, and have been, broadly interpreted. The history of farm support programs over the past 45 years substantiates the breadth of authority which defendant claims in this action. We shall refrain from presenting a complete history of the C.C.C. as intervenors have ably done in a 61-page brief. Nonetheless, a brief summary of the C.C.C. and its farm support programs is in order.

The C.C.C. was created in 1933 by President Roosevelt's Executive Order No. 6340 under authority granted by the National

Industrial Recovery Act. The original powers of the C.C.C. were virtually unlimited, as it was authorized to do "any and all things which may be necessary to accomplish the purposes" of numerous acts passed by Congress, including the Agricultural Adjustment Act of 1933, the National Industrial Recovery Act of 1933, the Federal Emergency Relief Act of 1933, the Reconstruction Finance Corporation Act of 1932, the Federal Farm Loan Act of 1916, and the Farm Credit Act of 1933. 79 Cong.Rec. 1552 (1935). Almost from the beginning the C.C.C. utilized cooperatives in the administration of various types of farm support programs. By 1948, the Secretary had extended support to 140 commodities, and was utilizing cooperatives to a significant extent. *See* 2 Fed.Reg. 2495 (1937) (cotton); 3 Fed.Reg. 123 (1938) (corn); 11 Fed. Reg. 9005 (1946) (peanuts); and 12 Fed.Reg. 157 (1947) (soybeans).

A significant example of the use of cooperatives was in the support for tobacco. At 11 Fed.Reg. 12781 (1946), the regulations specified that field execution of tobacco support operations was to be "carried out by organizations (producer cooperatives wherever possible and private concerns if found to be necessary)." The cooperatives were to contract with the C.C.C. to provide various administrative services. The regulations noted "loans are to be made to contracting organizations which in turn make advances at such rate to growers." The similarity to the challenged regulations is unmistakable. There was even an element of pooling, for the regulations further noted:

> Net gains accruing from the final marketing of the tobacco acquired by the contracting organizations will be distributed to the growers of the tobacco.

In 1948, Congress passed the Commodity Credit Corporation Charter Act in order to comply with the Government Corporation Control Act of 1945, which required that all federal corporations receive a federal charter. The legislative history of that action can only be read as approving and continuing both the broad powers of the C.C.C. and the past methods utilized by the C.C.C. to carry out its powers. We have already referred to 15 U.S.C. § 714b, in which the broad powers of the C.C.C. were set out. The intent to grant broad powers clearly appears in a report of the Senate Committee on Agriculture and Forestry:

> The complexity of the demands on the Commodity Credit Corporation is apparent. Its obligations under the price-support programs cannot be readily ascertained. Emergency purchase programs cannot be foreseen at a given time during the year. It is the opinion of the subcommittee that flexibility of operation must be provided in order to carry out these responsibilities. [*S.Rep. No. 1022,* 80th Cong., 2d Sess. 3 (1948), U.S.Code Cong.Serv. 1948, pp. 2138, 2140.]

Limitations upon C.C.C. authority are set forth in 15 U.S.C. § 714c, but relate primarily to goals and purposes of the C.C.C., not the methods by which it carried out its mandate. The only limitation as to method is the admonition that

> . . . the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce.

This appears to the Court to be merely an admonition to refrain from utilization of Government facilities when cooperative or independent grain dealers' facilities are available. This issue shall be discussed again *infra* in relation to 15 U.S.C. § 713a–13.

We have already noted above that in passing the C.C.C. Charter Act of 1948, the Congress sanctioned the utilization of cooperatives in 15 U.S.C. § 714j. In activity leading to passage of the bill, the House Banking and Currency Committee recognized the C.C.C. practice of utilizing cooperatives:

> The loans made by the Corporation for price-support purposes are non-resource loans to farmers *or to cooperative associations* and are secured by the pledge of

agricultural commodities. (emphasis added) [H.Rep. No. 1790, 80th Cong., 2d Sess. 6 (1948)] *

We find no indication that the 1948 Charter Act was intended in any way to curtail the practices of the C.C.C. and Secretary of Agriculture up to that time of utilizing cooperatives as an aid to administration of farm programs.

After passage of the C.C.C. Charter Act, the Agricultural Act of 1949 was enacted. This major agricultural legislation clearly was intended to continue the past practices of the C.C.C. A House Committee report concerned with what is now 7 U.S.C. § 1421(a) noted:

This subsection contains a general authorization to the Secretary to carry out price support operations for agricultural commodities through the Commodity Credit Corporation and other means available to him, by means of loans, purchases, and other operations. This provision is similar to that in present legislation *and authorizes support programs similar to those conducted in the past.* . . . (emphasis added) [H.Rep. No. 998, 81st Cong., 1st Sess. 22 (1949)].

Since the major actions of 1948 and 1949, the Secretaries of Agriculture and the C.C.C. have continued to utilize cooperatives in various roles in the administration of commodity support programs. Utilization of cooperatives in a wide range of capacities in the farm support programs is a well established practice. The pooling concept has also been utilized frequently by the C.C.C. (*See* regulations cited in Table I, attachment to Doc. # 107.)

Plaintiff attempts to distinguish all past uses of cooperatives by asserting that former programs never involved loans *to* cooperatives. However, an examination of various regulations clearly indicates that past programs have involved exactly what is proposed here—loans to cooperatives which then passed the funds through to producers.

For example, 1948 regulations concerning rice, 6 C.F.R. § 655.20 (1949) stated that cooperatives would be eligible for loans if (a) the grower members were bound by contract to market through the association [compare with 7 C.F.R. § 1425.9]; (b) the major part of the rice marketed by the association was produced by members who were eligible producers [compare with 80% requirement at 7 C.F.R. § 1425.11]; (c) the members shared proportionately in the proceeds from marketings [compare with 7 C.F.R. § 1425.14(b)]; (d) the rice purchased from non-members was segregated sufficiently to assure that the rice placed under loan accurately reflected the quantity and quality of rice grown by members [compare with 7 C.F.R. § 1425.13]; and (e) the co-op had the legal right to pledge the rice as security for the loan [compare with 7 C.F.R. § 1425.12].

*See also* 13 Fed.Reg. 4996 (1948) (dry peas); 13 Fed.Reg. 5256 (1948) (dry edible beans); 14 Fed.Reg. 7193 (1949) (cotton); 6 C.F.R. § 434.1202e (1962) (honey).

Plaintiff attempts to distinguish all prior loan programs with seven arguments. First, plaintiff argues that the extension by the Secretary of loans to cooperatives for cotton, naval stores, rice, dry edible beans, soybeans, and honey occurred without any announcement of proposed rule-making or opportunity for public comment. This is, of course, true because the extensions occurred before there were any procedural requirements such as are presently applicable through the Administrative Procedure Act. However, we fail to see that this has any bearing whatsoever upon the *authority* of the Secretary to promulgate such substantive regulations.

Second, plaintiff argues that the regulations with respect to particular commodities are internally inconsistent. We understand plaintiff's argument to be that prior regulations, such as were recited above, extended loans to cooperatives under the conditions listed, while defining "producers" as farm-

---

* H.R.Rep. 1790 accompanied H.R. 6263, which was not passed. Still, this quotation illustrates congressional knowledge of C.C.C. practices.

ers. That is, it appears that prior regulations used the same definitions of "producer" as are present in today's regulations. Yet, those regulations also allowed loans to cooperatives apparently under the same theories that defendant advances today. In short, plaintiff contends that because its argument on the definition of "producers" and the distinction between loans *to* and loans *through* cooperatives has been continually rejected in practice, the prior regulations were inconsistent. We disagree. Rather, this indicates that the history of farm support programs rejects plaintiff's argument that loans to co-ops are illegal because co-ops are not "producers."

Third, plaintiff argues that the administrative history of the regulations reveals substantial differences between them and the recently promulgated regulations for wheat and feed grains. This is certainly true as to some of the regulations, for, as we have noted, throughout the years cooperatives have been utilized by the C.C.C. in a number of different capacities. However, the challenged regulations are indistinguishable in any major detail from many of the past programs (already referred to *supra*).

Fourth, plaintiff argues that pertinent provisions of past programs, including definitions in the regulations, are inconsistent with the position now asserted by the Secretary. By this contention, plaintiff returns to its argument based upon the definition of "producers". Since the argument in support of the Secretary's authority does not depend upon a definition of cooperatives as "producers", this distinction is irrelevant.

Fifth, plaintiff argues that the administrative history of the regulations demonstrates alternatives less anticompetitive than the recently promulgated regulations. While this may be an argument relevant to the issue of whether the decision to use this particular alternative was arbitrary and capricious, it is no argument against the Secretary's *authority* to follow this course of action.

Sixth, plaintiff points out that under the new regulations title to the grain, when it is placed in the pool, goes over to the cooperative and the farmer-producer retains only a beneficial interest in the grain. While plaintiff argues that this has not been the case during previous regulations, it appears to us that this assertion is inaccurate in light of the significant pooling activity encouraged by the C.C.C.'s past practices discussed above. Further, the beneficial interest retained by the farmer is clearly sufficient to entitle him to receive the benefit of the farm loan through his cooperative. A case cited by plaintiff, *United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 52 (8th Cir. 1973), clearly stands for the proposition that a "beneficial" interest is sufficient to entitle one to the benefits of a farm support loan.

Seventh, plaintiff argues that prior utilization of cooperatives in this capacity has been insubstantial in light of the size of the commodities involved. Plaintiff argues that wheat and feed grains are major crops—so much bigger than other commodities that the experience in other commodities is not even relevant. We first reject the legal argument that utilization of loans through cooperatives for other commodities cannot be precedent for utilization of loans through cooperatives for wheat and feed grains. Even if there were a difference in the size of the crops, the principle would be the same. Second, as a factual matter, plaintiff's attempt to characterize rice, cotton, and soybeans, among others, as "minor" crops fails. The annual soybean crop in the United States has a larger market value than the annual wheat crop. (Tr. 144)

Thus, all seven of plaintiff's attempts to distinguish past programs fail. It is our conclusion that the history of administrative practice strongly supports the action which the Secretary has attempted to take in this case. We face a long-standing and consistent administrative interpretation by the relevant agency which is entitled to strong judicial deference. *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 274–275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Red Lion*

*Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 381–382, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); *Universal Battery Co. v. United States*, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051 (1930); *Committee for Open Media v. F.C.C.*, 174 U.S.App.D.C. 333, 533 F.2d 1, 3–4 (1976).

The Supreme Court in *United States v. Midwest Oil Co.*, 236 U.S. 459, 472–473, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1914), a case involving a challenge to the Executive's practice of withdrawing public lands from private acquisition without special authorization of Congress after Congress had opened the lands up to occupation, noted the following:

> It may be argued that while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair, intended for practical men. Both officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself,—even when the validity of the practice is the subject of investigation.

The history of farm support programs indicates that Congress has long been aware of the C.C.C.'s practice of using cooperatives in a wide range of supporting activities. Every piece of legislation dealing with the C.C.C. since it was set up by Executive Order in 1933 has been passed *after* the C.C.C. began utilizing cooperatives as an administrative tool. Despite these numerous opportunities, Congress has never rejected the practice of utilizing cooperatives, but has, in fact, acted to extend past practices (which included utilization of co-ops) and has continually appropriated the funds to make such programs possible. Thus, tacit congressional approval is strong-

ly indicated. *Lykes v. United States*, 343 U.S. 118, 127, 72 S.Ct. 585, 96 L.Ed. 791 (1952); *United States v. Jackson*, 280 U.S. 183, 196–197, 50 S.Ct. 143, 74 L.Ed. 361 (1930); *National Lead Co. v. United States*, 252 U.S. 140, 146–147, 40 S.Ct. 237, 64 L.Ed. 496 (1920).

In *United States v. Jackson, supra*, the Supreme Court, after noting the rule that great weight is properly accorded to the construction consistently given to a statute by the Executive Department charged with its administration, stated:

> If there were any doubt on the question, the silence of Congress in the face of the long continued practice of the Department of the Interior in construing statutes [in a particular manner] . . . must be considered as "equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress." *United States v. Midwest Oil Co.*, 236 U.S. 459, 481, 35 S.Ct. 309, 59 L.Ed. 673. [280 U.S. at 196–197, 50 S.Ct. at 147]

In this case we may note, as the court did in *Rath Packing Co. v. Becker*, 530 F.2d 1295, 1312 (9th Cir. 1975), *aff'd* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977):

> Forty-two years of Congressional silence is strong evidence that Congress has acquiesced in the Secretary's interpretation of his powers. See *Flood v. Kuhn*, 407 U.S. 258, 283, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Finally, we return to plaintiff's argument that the challenged regulations violate the purpose of the various agricultural acts which is to aid the farmer and insure an adequate farm income. We reject this argument, for it appears to us that the purpose of the regulations is, primarily if not solely, to benefit the farmer. The pass-through provision of the regulations allows the farmer who presently cannot obtain the price support loan if he places his grain in a cooperative's "pooling" arrangement, to obtain such a loan. In addition, the new regulations promote "pooling" which, it is

hoped, will allow farmers to band together in cooperative marketing associations to become a real power in the exporting of grain with the ultimate purpose of increasing the proceeds from the sale of grain. *See* 15 U.S.C. § 714c(f). Thus, the farmer clearly is aided by these regulations and nothing contained therein is inconsistent with the purpose of the various agricultural acts.

■ Thus, we think it clear that both the statutory language and the appropriate legislative and administrative history give the defendant broad discretion in the administration of price support loans. The Secretary has the authority, which he has traditionally exercised, to work through cooperatives in the administration of these loans. The present regulations are merely an extension of past practices. They are consistent with the purposes of the various farm bills, for the cooperatives act only as a fiscal conduit for the loans. The cooperatives hold the wheat, but the farmers retain the beneficial interest therein, and are thus able to enjoy the benefits of the price support loan. Thus, the challenged regulations allow the farmer to obtain the benefits of the price support loan while adding another marketing mechanism—utilization of a cooperative pool—to his small arsenal. We do not think the Secretary can be faulted for either his goal or his method of achieving that goal; the authority for this practice is clearly sufficient.

3. WAS PROMULGATION OF THE REGULATIONS "ARBITRARY AND CAPRICIOUS"?

Plaintiff requests that we "hold unlawful and set aside [this] agency action" on the grounds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706(2)(A). Before we examine the specifics of the Secretary's actions to determine whether they are "arbitrary and capricious", we should discuss the legal standard by which the actions must be judged and the record upon which our judgment in that regard must be based.

In promulgating the challenged regulations, defendant followed the informal rule-making procedure explicated in 5 U.S.C. § 553. Plaintiff does not deny that the procedure set forth in 5 U.S.C. § 553 is the proper procedure for the rule-making that occurred in this instance. The parties agree that the standard by which a Court may review informal rule-making is the "arbitrary and capricious" standard of 5 U.S.C. § 706(2)(A). *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *American Medical Ass'n v. Mathews*, 429 F.Supp. 1179, 1204 (N.D.Ill.1977).

■ Complete review of informal rule-making requires a Court to examine three questions. First, the Court must consider whether the action was within the scope of the agency's authority. (This has already been considered.) Second, the Court must consider whether the proper procedural requisites were met. Third, the Court must decide whether the action taken by the agency was "arbitrary and capricious". *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 415–417, 91 S.Ct. 814.

Turning to the issue of whether defendant followed the proper procedural requisites in promulgating the challenged regulations, it appears that defendant followed the prescribed steps for informal rule-making set forth in 5 U.S.C. § 553(b). On April 12, 1977, the defendant published in the Federal Register a notice of proposed rule-making. The comment period began on that day and ran until May 27, 1977. Following evaluation of the comments, it was announced that the Department would proceed toward final publication of the rule. On August 9, 1977, the regulation was published in final form in the Federal Register.

Plaintiff's arguments as to procedure are essentially two in number: (1) the defendant did not follow the procedures set forth in the National Environmental Policy Act (N.E.P.A.), and (2) the defendant did not submit the regulations for formal approval by either the C.C.C. Advisory Board, or the C.C.C. Board of Directors.

The Court does believe that defendant adequately evaluated the comments before him which pertained to environmental issues, and properly rejected them. However, because we have some reservations about whether proper N.E.P.A. procedure was followed in this case, we have examined this issue in detail in a later section of this opinion. No further discussion need occur here.

Defendant candidly admits that the regulations were not submitted for the formal approval of the C.C.C. Advisory Board. The reason for non-submission is that no C.C.C. Advisory Board was in existence at the time the regulations were promulgated. Created in 1949 by 15 U.S.C. § 714g(b), the Advisory Board has been eliminated pursuant to the Federal Advisory Committee Act of 1972, § 14, which provided:

(a)(1) Each advisory committee which is in existence on the effective date of this Act shall terminate not later than the expiration of the two-year period following such effective date unless—

. . . . .

(B) in the case of an advisory committee established by an Act of Congress, its duration is otherwise provided for by law. [5 U.S.C.App. I]

In the Federal Advisory Committee Act of 1972, Congress evinced a clear intent to eliminate and prevent the formation of unnecessary advisory committees. Sec. 2(b)(2). The Secretary of Agriculture presently has under advisement the decision as to whether the C.C.C. Advisory Board should be re-established. That is a discretionary decision unreviewable here. The plaintiff's challenge in this regard is, therefore, meritless, especially in light of the fact that the Advisory Board's capacity has always been purely advisory and not in any sense binding upon the Secretary.

A C.C.C. Board of Directors does exist. While the regulations were not formally submitted to the C.C.C. Board of Directors for its approval, four of the members of the Board took part in the decision to promulgate the regulations. Such formal approval was not required of the Secretary, who has the authority to set the terms and conditions for price supports pursuant to 7 U.S.C. §§ 1421, 1441, and 1429. Both the C.C.C. and its Board of Directors are "subject to the general supervision and direction of the Secretary", 15 U.S.C. §§ 714, 714g(a). The legislative history of the 1949 amendment to the C.C.C. Charter Act which placed the C.C.C. and its Board under the direction of the Secretary of Agriculture clearly indicates that while the C.C.C. was to be the operational arm of the Secretary, the Secretary was to make the decision as to the manner in which farm supports were to be extended. [95 Cong.Rec. 4927–4928, 4936 (1949).

■ There seems little doubt that the Secretary had full authority to issue the challenged regulations without the formal approval of the C.C.C. Advisory Board or the C.C.C. Board of Directors. To some extent plaintiff admits that formal approval of these two entities was not procedurally required, but argues the failure to obtain that approval demonstrates arbitrary and capricious conduct. In light of the extensive consultation with other officials of the U.S.D.A. and the C.C.C. made before the promulgation of these regulations, we find this argument invalid. (Bergland Depo., p. 10, Tr. 762)

■ We therefore turn to the third facet of judicial review of informal rule-making—a determination of whether the action was "arbitrary and capricious". Two factors enter into this determination: (a) whether the decision was based on a consideration of the relevant factors, and (b) whether there has been a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. 814; *Sabin v. Butz*, 515 F.2d 1061, 1067 (10th Cir. 1975).

The Court's inquiry in this regard is to be "searching". *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. 814; *Miller v. United States*, 438 F.Supp. 514, 522–523, n. 4 (E.D.Pa.1977). That is, the Court must make a "substantial inquiry" into the "reasonableness" of the

agency's action. *Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App. D.C. 373, 541 F.2d 1, 35, *cert. denied*, 426 U.S. 941, 96 S.Ct. 2660, 49 L.Ed.2d 394 (1976); *American Petroleum Institute v. E.P.A.*, 540 F.2d 1023, 1028 (10th Cir. 1976), *cert. denied*, 430 U.S. 953, 97 S.Ct. 1597, 51 L.Ed.2d 802 (1977); *Hill v. Morton*, 525 F.2d 327, 328 (10th Cir. 1975).

On the other hand, the Court must remember that the burden of proving that an agency action is arbitrary and capricious is upon the plaintiff. *Angel v. Butz*, 487 F.2d 260, 263 (10th Cir. 1973), *cert. denied*, 417 U.S. 967, 94 S.Ct. 3170, 41 L.Ed.2d 1138 (1974). Plaintiff must overcome the presumption of validity and regularity that attaches to agency actions. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 415, 91 S.Ct. 814; *Ethyl Corp. v. Environmental Protection Agency, supra*, 541 F.2d at 34; *F.T.C. v. Stanley H. Kaplan Ed. Center Ltd.*, 433 F.Supp. 989, 994 (D.Mass.1977); *American Medical Ass'n v. Mathews, supra*, 429 F.Supp. at 1204.

A Court is not allowed to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. 814; *Ethyl Corp. v. Environmental Protection Agency, supra*, 541 F.2d at 34; *Diamond Ring Ranch, Inc. v. Morton*, 531 F.2d 1397, 1407 (10th Cir. 1976). Rather, a Court must uphold any agency action which has a "rational basis". *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Ethyl Corp. v. Environmental Protection Agency, supra*, 541 F.2d at 34. In fact, if a Court determines that an agency action has a rational basis, it must affirm that action even though it disagrees with the agency's decision. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra*, 419 U.S. at 290, 95 S.Ct. 438; *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

The *de novo* review which plaintiff would prefer that we undertake in this case

is limited under the Administrative Procedure Act (A.P.A.) to two situations which are not applicable here: (1) when the agency action is adjudicatory in nature and the agency fact-finding procedures are inadequate, and (2) when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 415, 91 S.Ct. 814.

One of the major reasons why *de novo* review of informal rule-making is inappropriate is that such action is legislative in character. *South Terminal Corp. v. Environmental Protection Agency*, 504 F.2d 646, 655–656 n. 6 (1st Cir. 1974), *citing Amoco Oil Co. v. E.P.A.*, 163 U.S.App.D.C. 162, 501 F.2d 722, 734–735 (1974). An agency must be given great latitude in making the quasi-legislative decision of choosing a policy which it deems to be in the public interest. *Greater Boston Television Corporation v. F.C.C.*, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701, *reh. denied*, 404 U.S. 877, 92 S.Ct. 30, 30 L.Ed.2d 125 (1971).

This brings us to the difficult issue of the scope of the administrative record upon which our review is to be based. Because rule-making is policy oriented, rather than adjudicatory in nature, the record upon which it is based need not be as complete as in the adjudicatory situation in which fact-finding is required. *Consumer Union of U.S., Inc. v. Consumer Product Safety Comm'n*, 491 F.2d 810, 812 (2d Cir. 1974).

The Supreme Court recently spoke on the subject of what record should serve as the basis for Court review of administrative decisions. In *F.P.C. v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976), the Court wrote:

. . . we have consistently expressed the view that ordinarily review of administrative decisions is to be confined to "consideration of the decision of the agency . . . and of the evidence on which it was based." *United States v.*

*Carlo Bianchi & Co.*, 373 U.S. 709, 714–715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

*See also Roberts v. Morton*, 549 F.2d 158, 160 (10th Cir. 1977); *Ballard E. Spencer Trust, Inc. v. Morton, supra*, 544 F.2d at 1069; *Nickol v. United States*, 501 F.2d 1389, 1390 (10th Cir. 1974).

 Thus, unless the plaintiff affirmatively demonstrates that the administrative record upon which the defendant's decision was made was inadequate, our review must be limited to the administrative record. The only exception is that the Court may entertain the testimony of agency officials for "explanatory" purposes, that is, to explain the decision-making process that was utilized. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 420, 91 S.Ct. 814; *Camp v. Pitts, supra*, 411 U.S. at 143, 93 S.Ct. 1241; *Independent Meat Packers Ass'n v. Butz, supra*, 526 F.2d at 239. As noted in *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975):

A failure of the agency adequately to explain its actions is not a warrant to the district court to conduct a *de novo* evidentiary hearing, *Camp v. Pitts, supra.* "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." 411 U.S. at 142, 93 S.Ct. at 1244. Instead, the remedy under these circumstances is "to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Id.* at 143, 93 S.Ct. at 1244; cf. *Kennecott Copper Corp. v. EPA, supra*, 149 U.S.App.D.C. 231, 462 F.2d 846.

 Of course, these explanatory affidavits cannot constitute mere *post hoc* rationalizations for the action taken. *Citizens to Preserve Overton Park v. Volpe,*

*supra*, 401 U.S. at 419, 91 S.Ct. 814; *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *American Petroleum Institute v. E.P.A., supra*, 540 F.2d at 1029. In addition, if we are to uphold agency action, we must do so on the basis of reasons supplied by the agency itself, not provided by the Court. *Bowman Transport v. Arkansas-Best Freight System, supra*, 419 U.S. at 286, 95 S.Ct. 438; *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Coriolan v. Immigration and Naturalization Service*, 559 F.2d 993, 999 (5th Cir. 1977); *Ethyl Corp. v. Environmental Protection Agency, supra*, 541 F.2d at 100 n. 140.

 We have examined the administrative record extant in this action. We have reviewed plaintiff's criticisms of that record. It is our conclusion that the record is more than adequate to provide a sufficient basis for review without a *de novo* examination of evidence outside the administrative record. The record consists of, *inter alia*, (1) over 7000 comments submitted by interested persons, (2) a 16–page "Analysis" of the proposed regulations; (3) a June 6, 1977, draft economic impact statement; (4) a summary of comments received; (5) a July 15, 1977, economic impact statement; (6) an Environmental Impact Statement Assessment; (7) a June 2, 1977, economic impact statement summary; (8) the proposed rules published in the Federal Register on April 12, 1977; (9) the final rules published in the Federal Register on August 9, 1977; (10) a memorandum from the Acting Director, Grains, Oilseeds and Cotton Division of U.S.D.A. to the Executive Vice President of the Commodity Credit Corporation concerning the pros and cons of the proposed regulations; (11) certain miscellaneous memoranda; (12) numerous letters written by U.S.D.A. officials to interested parties; and (13) numerous letters written to U.S.D.A. by interested parties.

 This descriptive definition of the administrative record necessarily rejects plaintiff's argument that no documents prepared after June 2, 1977, should be con-

sidered part of the administrative record. This argument is based upon plaintiff's contention that the final decision to promulgate these regulations was made on June 2, 1977, and that all documents prepared thereafter are merely *post hoc* rationalizations. It is quite clear that a decision to proceed toward final publication of the regulations was made by defendant on June 2, 1977. However, the officials of U.S.D.A. have uniformly testified that the June 2 decision was not final, and that had subsequent studies of either the economic or the environmental impact of the regulations provided a basis for abandoning the proposed regulations, they would have done so. (Tr. 551 (Fitzgerald), Tr. 767, 863–864 (Hjort), Bergland Depo. pp. 28, 53, Freeman Depo. pp. 64, 81). While there is no doubt that there would have been hesitation to abandon a program for which it had been announced that "all systems were go", we were not presented with a showing of bad faith on the part of U.S.D.A. officials which would cause us to reject their testimony in this regard. Therefore, all of the administrative record compiled before final publication on August 9, 1977, should be considered by the Court during judicial review.

In addition, the Court has received testimony, by deposition, affidavit, or live appearance, of U.S.D.A. officials including defendant Secretary Bergland, Howard W. Hjort, Director of Economics, Policy Analysis and Budget, Ray Fitzgerald, Administrator of the A.S.C.S. and Executive Vice President of the C.C.C., Claude B. Freeman, Acting Director, Grains, Oilseeds and Cotton Division, A.S.C.S., Dale W. Wilson, Cooperative Program Specialist, U.S.D.A. and Charlie Robbins, Program Specialist, A.S.C.S. We have accepted the *post hoc* testimony of these officials only for the purpose of finding an explanation of the decision-making process which was utilized, and not for the purpose of discovering a *post hoc* rationalization for the action taken. Therefore, we have viewed the testimony of all these officials critically.

In view of the administrative record, its contents, and the explanation which we have received of its formulation, we find no reason to go outside the administrative record to review the action taken, except with regard to the N.E.P.A. compliance, as was explained earlier. We believe that the record is adequate; plaintiff has not carried its burden of proving that *de novo* review would in any sense be warranted.

We now turn to plaintiff's arguments concerning the alleged failure to consider relevant factors and the alleged arbitrary and capricious nature of the Secretary's action. A distillation of plaintiff's arguments shows that it believes the Secretary's action was faulty for three major reasons: (1) the action taken bore no relation to any legitimate goals of the U.S.D.A.; (2) the Secretary ignored or misanalyzed the comments submitted pursuant to the informal rulemaking procedure; and (3) the Secretary ignored or misanalyzed the potential anticompetitive effects of the challenged regulations. We shall analyze these contentions in turn.

Turning to the argument that the action taken bore no rational relationship to any legitimate goal of the U.S.D.A., we first note that which we stated above in discussing the Secretary's authority to issue these regulations. The pass-through provision of the regulations allows the farmer who presently cannot obtain the price support loan if he places his grain in a cooperative's pooling arrangement, to obtain such a loan. The action eliminates discrimination in two ways. First, it eliminates discrimination against the wheat farmer who wishes to pool. Previously, all farmers but those who pooled could take advantage of the price support loan; now all farmers can. Second, it eliminates discrimination which previously allowed the producers of many other commodities such as rice, soybeans, and cotton to work through cooperatives if they desired, but prevented the producers of wheat, rye, oats, grain sorghum, corn, and barley from so utilizing their cooperatives.

In addition, the new regulations promote pooling which, it is hoped, will allow farmers to band together in cooperative marketing associations to become a more impor-

tant presence in the exporting business with the ultimate purpose of increasing the return to farmers from the sale of their grain. This action seems to the Court to be consonant with the goals set forth in 12 U.S.C. § 1141(a)(3), which states that it is the policy of Congress to promote the effective merchandising of agricultural commodities, both at home and abroad, by encouraging the organization of producers into effective associations. *See also* 15 U.S.C. § 714c(f).

▌ The Proposed Rules published in the Federal Register on April 12, 1977, 42 Fed.Reg. 19149 [PX # 9], stated that the purpose of the proposed amendments to 7 C.F.R. §§ 1421, 1425 was as follows:

> The proposed amendment is needed to afford the producers of these commodities use of the same marketing tool that is currently available to certain other commodities.

We hold that this is a reasonable goal of the U.S.D.A., and that the challenged regulations constitute a rational method of obtaining this goal.

We therefore turn to plaintiff's argument that the Secretary ignored or misanalyzed the comments submitted pursuant to the informal rule-making procedure.

Accompanying the final version of the regulations in the Federal Register was a "basis and purpose" statement which contained a "Discussion of Major Comments." *See* 42 Fed.Reg. 40175, 40177, 40179, 40180, 40182, 40184, 40185, 40187 (Aug. 9, 1977).

In discussing the comments which supported the proposal, the "basis and purpose" statement noted that they came from a wide range of sources and supported the proposed regulations for four primary reasons: (1) they would create more competition in exports; (2) they would directly benefit individual producers who are presently unable to obtain price support loans after giving their grain to cooperatives; (3) they would help create a more orderly marketing system; and (4) they would improve the economic position of cooperative members.

In discussing the comments opposing the proposal, the "basis and purpose" statement noted that nearly 5000 comments had been received, and 2700 opposed the proposed regulations while 1900 favored it. The statement noted that 1800 of the opposing comments were generated from one source, the National Farmers Organization (N.F. O.), which opposed the regulations for two primary reasons: (1) they would delegate the administration function for granting loans from the A.S.C.S. to the cooperatives, and (2) farmers would be required to join cooperatives to be eligible to obtain such loans. The statement noted that these two arguments were based upon a misconception of the regulations and that neither was valid. The statement was certainly accurate in this regard.

The statement noted that the opposing comments contained four other major arguments against the proposed regulations. First, the comments argued the new regulations would discriminate in favor of cooperatives by granting them significant financial advantages in the form of the loans. However, the "basis and purpose" statement concluded that no such financial advantage would accrue to the cooperatives, for they would be required to pass the loans on to the producers. Second, the comments argued the new regulations would result in a shifting of grain handling away from the independents to the cooperatives and, as a result, would allow the cooperatives to gain a monopoly. The "basis and purpose" statement rejected the monopoly argument noting that it was the projection of the U.S.D.A. studies that in 1981 only 6% of the feed and grain crops of the United States would be put under loan by cooperatives. That fact, coupled with the conclusion that the new regulations would grant the cooperatives no financial advantage, led the statement to conclude that the threat of monopoly was not significant. Third, the opposing comments argued that the regulations constituted an unlawful exercise of authority by the Secretary. The "basis and purpose" statement rejected this argument for some of the same reasons which we utilized in rejecting this argument *supra.*

Fourth, the opposing comments referred to the significant tax advantage which cooperatives presently have over independent grain dealers. The "basis and purpose" statement rejected this argument on the grounds that the proposed regulations would not affect this situation.

Plaintiff launched several attacks upon the Secretary's discussion of the comments. First, plaintiff originally argued that the Secretary had ignored some 2,000 comments which had been submitted since the "basis and purpose" statement discussed only 5000 comments, yet the Secretary produced some 7000 during discovery. This was explained by defendant who noted that the final 2000 comments were received after the May 27, 1977, deadline for receiving comments and were therefore not discussed in the "basis and purpose" statement. Nonetheless, defendant's evidence indicated that these comments were considered despite their late submission. (Tr. 577) Second, plaintiff contended that the Secretary ignored the fact that some 69% of the comments were opposed to the proposed regulations. However, informal rule-making is not a popularity contest and we see no substance to this argument. Third, plaintiff argued that the "basis and purpose" statement mischaracterized the source of the comments by ignoring the fact that Farmland Industries was a major source of the "pro" comments and not mentioning the wide range of sources for the "con" comments. While it does appear to the Court that there is some truth to plaintiff's allegations in this regard, we do not regard it as a critical factor. Both pro and con comments were submitted by a fairly wide range of entities. The N.F.O. was responsible for submission of a large number of "con" comments. Cooperatives such as FAR–MAR–CO were responsible for submission of a large number of "pro" comments. Again, this is not a popularity contest. Fourth, plaintiff argued that the Secretary stated that one of the purposes of the regulations was to promote the cooperatives as a viable entity in the exporting of grain while ignoring that co-ops are already a major exporter. The facts indicate that while the cooperatives are a growing force in the export scene, they still have only a small share of the market. Fifth, plaintiff argued that the Secretary ignored the comments which raised environmental concerns. However, it appears that only three of the 7000 comments raised such concerns (all relating to use of energy), and those comments were speculative and conclusory in nature. Further, specific testimony indicated that effects upon energy were, indeed, considered. (Robbins Depo., p. 24) Sixth, plaintiff alleged that the discussion of the comments omitted consideration of possible disruptive trading practices arising from cooperatives amassing large pools of grain. Any potential disruption of this type is caused by pooling, not by the regulations. Plaintiff's counsel and witnesses have repeatedly stated that plaintiff has no objection to the practice of pooling. Therefore, the Secretary need not have discussed potential disruptive trading practices.

Finally, plaintiff argued that the Secretary was biased in his discussion of the comments because he has a long history of supporting cooperatives. We note that many of defendant's statements which plaintiff cites in support of this contention are similar to political statements made by past Secretaries of Agriculture. (Tr. 619) The Court will not take the position that the fact that an appointed government official has, prior to his entering government service, supported certain programs, disqualifies him from acting to implement those programs after he enters government service. This, it appears to us, is the position plaintiff wishes us to assume. A Secretary of Agriculture need not make his decisions upon the basis of a "clean slate". As was noted in *Movement Against Destruction v. Trainor,* 400 F.Supp. 533, 547 (D.Md.1975):

> Subjective impartiality is not required, however, but only an open mind, willing and able to exercise good faith objectivity in weighing the reasons, pro and con, for taking a particular action in compliance with the responsibility imposed upon that official by law. *Environmental Defense*

484

Fund v. Corps of Engineers, U.S. Army, 470 F.2d 289, 296 (8th Cir. 1972), cert. denied 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); MAD v. Volpe, supra, 361 F.Supp. at 1389.

See also Carolina Environmental Study Group v. United States, 166 U.S.App.D.C. 416, 510 F.2d 796, 801 (1975); Skelly Oil Company v. F.P.C., 375 F.2d 6, 17–18 (10th Cir. 1967), aff'd in part, rev'd in part, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

■■■■ An agency engaged in informal rule-making must "genuinely consider" the comments it receives from interested parties. Natural Resources Defense Council v. U.S. Nuclear Reg. Com'n, 178 U.S.App.D.C. 336, 547 F.2d 633, 646 (1976), cert. den., 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977). However, there is no requirement that the agency discuss in great detail all comments, especially those which are frivolous or repetitive, in the "basis and purpose" statement. Natural Resources Defense Council v. U. S. Nuclear Reg. Com'n, supra, 547 F.2d at 646; General Telephone Company of the Southwest v. F. C. C., 449 F.2d 846, 862 (5th Cir. 1971); American Medical Ass'n v. Mathews, supra, 429 F.Supp. at 1204. Defendant Bergland was personally apprised of the nature of the comments, both pro and con. (Tr. 545, 763, 810) We consider the discussion provided by the Secretary in this instance to be more than adequate to meet the applicable standards for judicial review. The statement discussed all of the major arguments raised by the opposing comments and rejected them with reasoned statements which clearly indicated that the comments were "genuinely considered". The conclusions of the "basis and purpose" statement were adequately buttressed by the conclusions of the "Analysis". The "Analysis", in the Court's opinion, is not perfect but has withstood the post hoc attacks of plaintiff's experts.

The other major objection which plaintiff lodged against the "basis and purpose" statement was that it ignored or misanalyzed the potentially anticompetitive effects which the proposed regulations might have.

However, we believe that the statement's discussion of comments clearly indicates that consideration was given to the potential anticompetitive effects of the regulation. The explanatory testimony provided by the defendant indicated that the decision-making process which preceded the final publication of the challenged regulations did include serious consideration of potential anticompetitive effects, especially those allegedly stemming from the interest differential between the C.C.C. loan rate and the general commercial loan rate. (Tr. 546, 621, 789).

The conclusions of the "basis and purpose" statement are based, in part, upon an economic impact statement developed by a U.S.D.A. task force. (Tr. 811). The Secretary himself reviewed the economic impact statement after its completion. (Tr. 766) The comments which had been submitted as to the regulations were, of course, considered in the decision-making process. In addition, the U.S.D.A. officials were able to draw upon their expertise and experience, including a previous proposal to promulgate these same regulations. Further, the defendant and his subordinates studied the effects of similar regulations upon other commodities. (Bergland Depo., p. 63, Tr. 825).

■■■ While the conclusion reached by the U.S.D.A. that the regulations would not have any serious anticompetitive effects may not be completely satisfying to plaintiff, we find it reasonable and supported by the evidence in the administrative record. The administrative record demonstrates that defendant examined the major comments relative to the anticompetitive effects of the regulations. The "Analysis" and Economic Impact Statement, upon which the defendant's conclusions were based, examined virtually every area of concern which has been raised by plaintiff in this litigation.

■■■ Plaintiff seems to forget that informal rule-making does not require the strict fact-finding and reason-giving that might be needed in agency adjudication. Florida Sugar Cane League, Inc. v. Usery, 531 F.2d

299, 303 (5th Cir. 1976); *Mobil Oil Corporation v. Federal Power Commission,* 152 U.S. App.D.C. 119, 469 F.2d 130, 139 (1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973). Rather, the Court should look to the "basis and purpose" statement only to see whether it appears that the agency "ventilated the major issues" and gave reasoned explanations of why it reacted as it did. *Natural Resources Defense Council v. U. S. Nuclear Reg. Com'n, supra,* 547 F.2d at 646; *General Telephone Company of the Southwest v. F. C. C., supra,* 449 F.2d at 862; *Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S. App.D.C. 200, 407 F.2d 330, 338 (1968); *American Medical Ass'n v. Mathews, supra,* 429 F.Supp. at 1204. While we may concede that the Secretary's "basis and purpose" statement is certainly not so overwhelmingly complete, detailed, and persuasive as to win over critics such as plaintiffs, we also recall that a court can sustain a decision of "less than ideal clarity". *Bowman Transp. v. Arkansas-Best Freight System, supra,* 419 U.S. at 286, 95 S.Ct. 438; *Colorado Interstate Gas Co. v. F. P. C.,* 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *Coriolan v. Immigration and Naturalization Services, supra,* 559 F.2d at 999; *Kurzon v. United States Postal Service,* 539 F.2d 788, 792–793 (1st Cir. 1976); *Alabama Power Company v. F. P. C.,* 167 U.S.App. D.C. 145, 511 F.2d 383, 392 (1974).

In addition, even if the challenged regulations did result in certain advantages to cooperatives, the defendant could not be faulted for such action. The special nature of cooperative organization has long been considered to justify special treatment of cooperatives. This shall be discussed in greater detail later in this opinion. The important point to remember is that even if the regulations result in more profits to cooperatives, those will be channeled to farmers, who are the cooperative's owners, not to stockholders. (Tr. 675). Thus, a benefit to cooperatives is a benefit to farmers directly. A decision to so aid farmers cannot, therefore, be considered arbitrary and capricious. The Supreme Court made this point in *United States v. Rock Royal*

*Cooperative, Inc.,* 307 U.S. 533, 564, 59 S.Ct. 993, 1008, 83 L.Ed. 1446 (1939), when it noted that the organizational differences between cooperatives and non-cooperative corporations had repeatedly been held to justify differential treatment of them, and wrote:

The producer cooperative seeks to return to its members the largest possible portion of the dollar necessarily spent by the consumer for the product with deductions only for modest distribution costs, without profit to the membership cooperative and with limited profit to the stock cooperative. It is organized by producers for their mutual benefit. For that reason, it may be assumed that it will seek to distribute the largest amount to its patrons.

We think, as shall be discussed in greater detail *infra,* that no significant financial advantage flows to cooperatives from these regulations. The primary impact that the regulations will have is to put a limit on the "down-side" risk of the farmers who pool. After these regulations are implemented, farmers who pool will not be clobbered if grain prices drop below the support level. Plaintiff terms this a "bail-out" of Pro-Mark. We believe that the Secretary has the discretion to remove this disincentive to pooling by extending the Form G loan to which all other farmers have access to those farmers who wish to pool.

Thus, if the Secretary has determined to aid cooperatives in the manner described as part of an overall program to boost the farm sector of the economy, the Court cannot hold that decision "arbitrary and capricious."

Our review of the administrative record leads us to these conclusions: (1) the record adequately ventilated all the major issues; (2) the record demonstrates that the defendant thoroughly considered all major comments submitted and reasonably explained why opposing comments were rejected; (3) the record demonstrates that all relevant factors were considered by defendant, especially those relating to potential

anticompetitive effects of the regulations; and (4) the defendant's judgment to proceed with promulgation and implementation of the challenged regulations, upon the evidence before him, can in no way be termed "arbitrary and capricious."

## 4. ARE THE REGULATIONS INVALID BECAUSE OF DEFENDANT'S FAILURE TO FILE AN ENVIRONMENTAL IMPACT STATEMENT?

It is plaintiff's further contention that this Court should enjoin the implementation of the challenged regulations for defendant's failure to file an environmental impact statement (EIS). Plaintiff alleges that such failure violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* the regulations of the Council on Environmental Quality, 40 C.F.R. § 1500.1 *et seq.,* and the regulations of the Department of Agriculture itself, 7 C.F.R. § 799.1 *et seq.*

In addition, a claim that defendant violated the Clean Air Act Amendments of 1970, 42 U.S.C. § 1857h–7 [recently changed to 42 U.S.C. § 7609] has appeared in this suit for the first time in plaintiff's post trial brief.

### (A) STANDING UNDER THE N.E.P.A.

■ An initial inquiry which should be made in this area is whether plaintiff has standing to challenge defendant's decision not to file an environmental impact statement. It is well established that standing to sue is an essential element of a cause of action and must be demonstrated as well as alleged. *Sierra Club v. Morton,* 169 U.S. App.D.C. 20, 514 F.2d 856, 870 n. 20 (1975), *rev'd on other grounds,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

A plaintiff alleging an N.E.P.A. cause of action must, as indicated above, meet the standing requirements set forth in *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), by alleging (1) that the challenged agency action has caused him "injury in fact", and (2) that the injury was to an interest arguably within the "zone of interests" to be protected by the N.E.P.A. *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Concerning the "injury in fact" requirement, we noted in our order concerning the preliminary injunction that the essence of plaintiff's position is that the class will suffer economic harm from the challenged agency action because said action will enhance the competitive position of the cooperative grain dealers. There can be no doubt that this economic harm is the motivating factor behind this litigation.

However, in an attempt to allege an N.E.P.A. cause of action, plaintiff's brief in support of a preliminary injunction listed certain "socio-economic harms" which it was alleged would occur if the challenged regulations were implemented. The alleged harms were essentially employment-related, and were based upon the premise that implementation of the challenged regulations would cause farmers to stop dealing with independents and begin dealing with co-ops, resulting in unemployment problems for the independents with a resulting impact on the "socio-economic life of the communities they serve." In our order denying plaintiff's request for preliminary injunctive relief, we noted the following:

> Due to comments made by the Court in chambers, it appears that plaintiffs' counsel "went to school" by reading this Court's opinion in *City of Topeka v. G.S.A.,* 76–215–C5 (D.Kan., 4/8/77, unpublished). In that opinion, this Court indicated that while "socio-economic harms" should definitely be considered should an agency be required to file an EIS, such harms could not, in and of themselves, mandate the filing of an EIS. Socio-economic harms need only be considered in conjunction with a discussion of a *primary* harm to the physical environment. As one court recently noted:
>
> > . . . the importance of such [socio-economic] factors is secondary to the ecological considerations which must assume a primary role in evaluating the environmental impact of a federal action. *Breckinridge [v. Rumsfeld], su-*

*pra* [537 F.2d 864], at 866 [(6th Cir. 1976)]. Without allegations of an ecological impact on the environment, the provisions of NEPA simply are not applicable. [*Township of Dover v. United States Postal Service,* 429 F.Supp. 295, 297 (D.N.J.1977)]

*See also Metlakatla Indian Community v. Adams,* 427 F.Supp. 871, 874 (D.D.C. 1977); *National Ass'n of Government Emp. v. Rumsfeld,* 418 F.Supp. 1302, 1307 (E.D.Pa.1976).

With these holdings in mind, plaintiffs filed a "Supplemental Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction." In said brief, plaintiffs attempted to produce adequate allegations of damage to the physical environment resulting from implementation of the challenged regulation. While plaintiffs' allegations show some imagination, they were not supported in the preliminary injunction hearing with any evidence which would lead the Court to believe that there is need for concern relative to this regulation's impact upon the physical environment.

In relation to the "injury in fact" requirement, we deem it decisive to note that plaintiff attempts to show injury to the class members only in terms of competitive injury and the resulting unemployment to their employees. The environmental concerns which plaintiff's counsel later called to the Court's attention are not shown to directly affect the plaintiff class. Therefore, the plaintiff class members meet the "injury in fact" test only as to the alleged economic harms, for the injury must occur to them or else they do not have standing. The Supreme Court held in *Sierra Club v. Morton,* 405 U.S. 727, 734–735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972):

But the "injury in fact" test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.

Unfortunately for plaintiff, the injury in fact which it is alleged will be suffered from the implementation of the regulation—economic—does not meet the "zone of interests" portion of the standing test. The N.E.P.A. simply was not meant to be used as a device whereby plaintiffs with strictly economic interests would be allowed to thwart governmental activity under the guise of environmental interest. In *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411 (8th Cir. 1976), a group of common carriers filed petitions seeking to set aside an Interstate Commerce Commission order which had allowed an applicant to perform certain operations as a contract carrier in interstate commerce. The Eighth Circuit sustained defendant's objection to plaintiffs' standing to raise the N.E.P.A. claim by noting:

Petitioners, whose sole motivation in this case was their own economic self-interest and welfare, are singularly inappropriate parties to be entrusted with the responsibility of asserting the public's environmental interest in proceedings concerning the issuance of operating authority to motor carriers. Petitioners do not allege any environmental injury to themselves. Their interest in their economic well-being vis-a-vis their competitors is clearly not within the zone of interests to be protected by the National Environmental Policy Act. *Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* 510 F.2d 1037, 1038 (4th Cir.), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Convoy Co. v. United States,* Civil No. 74–757 (D. Ore., March 21, 1975). This Act was not designed to prevent loss of profits but was intended to promote governmental awareness of and action concerning environmental problems. [533 F.2d at 416]

The *Churchill Truck Lines* decision referred to the Fourth Circuit case of *Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* in which one hospital sought to enjoin the construction of another hospital two miles away. The alleged "injury in fact" was that construction of the second hospital would put the plaintiff hospital out of business. The Fourth Circuit found no standing:

If it has in fact suffered an injury, appellant's economic well-being vis-a-vis its competitors is certainly not "arguably within the zone of interests to be protected" by the Federal environmental laws. [510 F.2d at 1038]

See also *Gifford-Hill Company, Inc. v. F. T. C.,* 523 F.2d 730, 732 (8th Cir. 1975); *Delaware River Port Auth. v. Tiemann,* 403 F.Supp. 1117, 1144 (D.N.J.1975), *vacated on other grounds,* 531 F.2d 699 (3d Cir. 1976); *Zlotnick v. Redevelopment Land Agency,* 26 L.R. 20235 (D.D.C.1972), *aff'd* 161 U.S.App. D.C. 238, 494 F.2d 1157 (1974).

This is not to say that those with economic interests in the outcome of a proceeding may never bring an N.E.P.A. action. *National Helium Corp. v. Morton,* 455 F.2d 650, 655 (10th Cir. 1971); *Chamber of Commerce of U. S. v. Dept. of Interior,* 439 F.Supp. 762, 766 (D.D.C.1977); *City of Topeka, v. G. S. A.,* No. 76–215–C5 (D.Kan. 4/18/77 unpublished). Rather, as the Eighth Circuit pointed out recently in *Robinson v. Knebel,* 550 F.2d 422, 425 (8th Cir. 1977):

Individuals motivated in part by protection of their own pecuniary interest can challenge administrative action under NEPA provided that their environmental concerns are not so insignificant that they ought to be disregarded altogether.

■ We have carefully considered the allegations of environmental impact which have been made by plaintiff. Based upon what we consider (for reasons to be explained later in the opinion) the false premise that the challenged regulations will lead to a massive shifting of grain away from the independents to the cooperatives, plaintiff speculates that more energy may be expended in the transporting of grain, that air pollution from the handling of grain may increase, and that construction will be required so that cooperatives will have more storage space. Having examined the entire record in this case, we consider these allegations to be so attenuated, so speculative, and so obviously subordinate to plaintiff's primary economic interest that we cannot conclude that these plaintiff

class members who have not suffered any injury within the "zone of interests" protected by the N.E.P.A. should be allowed to represent an alleged "public interest" in this matter.

Rather, we view this case to be governed by the comments found in *Cummington Preservation Committee v. F. A. A.,* 8 E.R.C. 1121, 1123 (D.Mass.1975):

NEPA was formulated to protect conservational, environmental, and aesthetic interests. None of its admittedly broad terms protect individuals from economic loss. Congress did not intend this law to be a general enabling statute allowing opponents of federal projects to sue solely by invoking the magic word "environment" when their injury has factually nothing to do with the environment.

Similarly, in *Brooks v. Volpe,* 350 F.Supp. 269, 277 (W.D.Wash.1972), *supplemented* at 350 F.Supp. 287, *aff'd* 487 F.2d 1344 (9th Cir. 1973), the court noted:

Emotional environmentalism must be tempered with rational realism. Litigants must not be allowed to use NEPA as a tool to destroy federal programs under the guise of interest in the environment.

We conclude that plaintiff does not have standing to challenge the promulgation and implementation of the regulations in question upon N.E.P.A. grounds.

B) REVIEW OF ENVIRONMENTAL IMPACT STATEMENT ASSESSMENT.

Assuming only for the purposes of argument that plaintiff has standing to challenge the defendant's failure to file an environmental impact statement in this action, we proceed to a review of the substance of plaintiff's claims in the regard. In so doing, we find independent grounds for rejecting plaintiff's environmental arguments.

Rather than file an environmental impact statement (EIS), defendant filed an environmental impact statement assessment (EISA), which concluded that implementation of the challenged regulations would not

have a significant impact on the environment and therefore no EIS needed to be filed. Plaintiff alleges that this decision was erroneous under the applicable regulations of the U.S.D.A., as well as those of the C.E.Q., and under N.E.P.A.

In plaintiff's brief in support of the motion for a preliminary injunction, plaintiff alleged that U.S.D.A. guidelines, as set forth in 7 C.F.R. § 799.1 *et seq.* require an agency to consider all socio-economic effects of a proposed action before the taking of that action. Plaintiff further argued that implementation of the challenged regulations would have serious socio-economic effects. Later, plaintiff alleged and presented evidence supporting the contention that the regulations would also have primary effects upon the environment.

Plaintiff has also alleged procedural violations of both N.E.P.A. and the Clean Air Act Amendments of 1970.

The legal standards by which the defendant's decision not to file an EIS is to be judged are fairly well settled. The case law clearly indicates that the threshold decision as to whether an EIS need be filed lies with the defendant agency. *Hanly v. Kleindienst*, 471 F.2d 823, 828 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *County of Trinity v. Andrus*, 438 F.Supp. 1368, 1388 (E.D.Cal. 1977); *Texas Committee on Natural Resources v. Bergland*, 433 F.Supp. 1235, 1245–1246 (E.D.Tex.1977); *Matlakatla Indian Community v. Adams*, 427 F.Supp. 871, 874 (D.D.C.1977).

That determination is also committed to the discretion of the agency by the terms of the applicable regulation, 7 C.F.R. § 799.4. Subsections (1) and (2) of 7 C.F.R. § 799.4(b) describe the types of actions which normally require, and those which normally do not require the preparation of an EIS. The promulgation of the regulations with which we are concerned fall (as shall be explained in greater detail *infra*) within the third category set forth in § 799.4(b)(3), "Other major ASCS actions which may require and EIS." This portion of the regulations reads as follows:

Major actions (programs or projects) which do not fall under the criteria established by paragraph (b)(1) or (2) of this section *will require a decision by the responsible Federal official whether to prepare an EIS based on individual considerations.* The decision made is to be based on an appropriate environmental assessment of environmental factors and significant effects, including beneficial and adverse effects. Significant adverse effects may be those which degrade the environment, curtail the use of the environment, or serve only short-term needs. Assessment is to cover secondary effects such as socio-economic impacts as well as direct effects.

(i) Identifying major actions which may or may not significantly affect the environment. At least the following environmental factors are to be assessed by the committee as appropriate to determine whether an EIS is needed:

Upland wildlife habitat.
Bottom land wildlife habitat.
Wildlife migration routes.
Bottom land hardwoods.
Stream fisheries including potential not presently productive.
Wetlands.
Endangered animals and plants.
Natural streams.
Man-altered streams.
Archeological and historical resources.
Water quantity.
Air quality.
Appearance of the landscape.

(ii) The degree of public interest, potential controversy, urban or rural setting, and economic and social impacts should also be assessed. Factors are to be quantified and qualified to the extent practicable as to the total amount in the area, the amount affected by the proposed actions, and the percent of the total resources in the area which will be affected. No single or multiple effect of factors can give the absolute answer. The data, once assembled will provide an indication of the probable impact and aid in making a judgment as to whether an EIS is needed. (emphasis added)

**490**

The defendant has made the decision called for in § 799.4(b)(3), and that decision is contained in the EISA to which we have referred. The decision was that no EIS need be filed.

 It is not disputed that the decision not to file an EIS is normally reviewable by the Courts. Although there is some division of authority between the various Circuits, the standard by which we must judge the decision is that of "reasonableness". *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1249 (10th Cir. 1973). Normally a Court should at least require a statement of reasons as to why no EIS was filed [*Kelley v. Butz,* 404 F.Supp. 925, 934 (W.D.Mich.1975)], although such a statement is not always required. *Krueger v. Morton,* 176 U.S.App.D.C. 233, 539 F.2d 235, 240–241 (1976); *Friends of the Earth, Inc. v. Butz,* 406 F.Supp. 742, 746 (D.Mont.1975). The EISA filed in this case constitutes such a statement of reasons.

 A Court should not undertake to review the decision not to file an EIS unless the plaintiff is able to raise a "substantial environmental issue". *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 425 (5th Cir. 1973). Plaintiff must allege facts which, if true, would constitute a "substantial" impact upon the environment. *Sadler v. 218 Housing Corp.,* 417 F.Supp. 348, 354 (N.D.Ga.1976); *Jones v. United States Dept. of H. U. D.,* 390 F.Supp. 579, 591 (E.D.La.1974).

If plaintiff meets this initial burden, then the burden of proof shifts to the government to prove that it took a "hard look" at the environmental questions which it faced. *Maryland-National Cap. Pk. & Pl. Comm'n v. U. S. Postal Serv.,* 159 U.S.App.D.C. 158, 487 F.2d 1029, 1039–1040 (1973); *McDowell v. Schlesinger,* 404 F.Supp. 221, 250 (W.D. Mo.1975); *Simmans v. Grant,* 370 F.Supp. 5, 12 (S.D.Tex.1974). The Court should be convinced on three essential points:

1. That the agency took a "hard look: at the situation;
2. That the agency identified all the relevant environmental concerns; and

3. That, after identifying and studying the issues, the [agency] has convincingly demonstrated that any impact is not significant. [*Nader v. Butterfield,* 373 F.Supp. 1175, 1180 (D.D.C. 1974)]

We shall examine these three factors despite some hesitation in concluding that plaintiff has raised a "substantial environmental question." This hesitation results from the following facts: (1) plaintiff's primary concern in this litigation is its *economic* position, and therefore its motives in raising environmental concerns are somewhat suspect; (2) plaintiff's allegations concerning impacts upon the physical environment were raised in this litigation only as an afterthought; (3) of some 7000 comments directed by the public to the defendant discussing the possible effects of implementation of these regulations, only three discussed environmental issues in even a tangential manner; and (4) the evidence presented by plaintiff was unconvincing in a number of respects (as shall be explained *infra*).

The EISA filed in this case is less comprehensive than a reviewing court might hope. The EISA is only two pages long, and its most pertinent statements are these:

The proposed action would not appear to have any adverse environmental affect [sic] on any of the 12 factors listed to be considered in subdivision (i) of section 799.4(b)(3) of the regulation. [p. 1]

The economic impact statement on the proposed action did not reveal any significant economic impacts. The action should not cause any change in the production of the commodities which would effect [sic] the acreage planted for crop production nor would it change the volume of grain moving through elevators nor require more elevators to handle the grain. Therefore, it is determined that the proposed action is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act. [p. 2]

Fortunately for defendant, the EISA is not necessarily inadequate because of its conclusory terminology. *Friends of the Earth, Inc. v. Butz, supra,* 406 F.Supp. at 746.

The EISA relies heavily upon the findings contained in the Economic Impact Statement, which, relative to energy, noted:

The proposed action is not expected to effect [sic] energy supply. Some lessening of the demand for energy may result from encouraging the centralized handling of grain by cooperatives and from a tendency for grain to be transported over lesser distances owing to centralization of marketing decisions. [p. 5]

As for the total impact of the proposed regulations, the Economic Impact Statement concluded that "only a small portion, six percent by the 1981 crop year, of total U.S. wheat and feed grain production is expected to be placed under C.C.C. price support loans taken out by cooperatives." [p. 4]

The Economic Impact Statement is a shortened version of another document in the administrative record. "An Analysis of Extending the C.C.C. Cooperative Loan Program to Feed Grains and Wheat" (hereinafter "Analysis"), which reached, *inter alia,* the following conclusions:

The program is not expected to induce significant structural changes in the U.S. grain industry. [p. 2]

The program will have no appreciable effect on competition in the grain industry at the local, regional, or national level. [p. 2]

The combined volume of grain put under loan by cooperatives will not likely exceed that which would be put under loan by individual farmers in the absence of the expanded program. [p. 5] (See Tr. 785–786)

The expected level of participation also does not involve the volume of grain required for cooperatives to materially strengthen their position in international trade. The 382 million bushels expected to come under the program will be controlled by three or four regional coopera-

tives who will use these stocks to supply both domestic and foreign markets. [p. 15]

The Economic Impact Statement, and the "Analysis" upon which it was based are documents which are the result of significant amounts of research and study. While these documents are not perfect, after hearing all the evidence in this case we credit their conclusions. We think the defendant took a "hard look" at the factors which will be critical to a determination of whether plaintiff's allegations of environmental impact have any validity.

The question of whether defendant examined all relevant environmental concerns is a complicated one. On the one hand, the EISA did not specifically discuss all of the environmental impacts which plaintiff alleges will result from implementation of these regulations. This is not surprising, for the allegations of primary environmental impact are the product of not a small amount of ingenuity on the part of plaintiff. As noted earlier, of 7000 comments from the public sector as to the effect of these regulations, only three mentioned environmental concerns in even a marginal fashion. What we consider important is that the EISA, and the documents upon which it was based, did address various aspects of the effects of the regulations so that the answers to plaintiff's challenges are apparent from the administrative record and the subsequent explanatory data. For example, while the EISA did not specifically state that no marshlands would be destroyed by the new regulations, it did indicate that no new elevators would be built, thus implicitly answering plaintiff's argument.

Because of the brevity of the EISA in this case, we agree that the environmental issue deserves special attention. This is particularly so when we realize that the standard of review of the decision not to file an EIS, that of "reasonableness", is more stringent than the "arbitrary and capricious" standard which we have used to review the Secretary's action generally.

With these factors in mind, we proceed, as other courts have done, to evaluate the evidence that has been placed before the Court by the parties. Insofar as the environmental issue is concerned, we do not limit the scope of our inquiry to the administrative record. *See Simmans v. Grant, supra.*

We now consider the issue of whether the government has carried its burden of proof to convincingly demonstrate that any environmental impact of the regulations would not be significant. The conclusion of the EISA was that the impact would not be significant. Plaintiff challenged that conclusion by the presentation of evidence at trial. Defendant and intervenors acted to rebuff plaintiff's challenge primarily by (1) cross-examination of plaintiff's witness, (2) presentation of evidence that was explanatory of the conclusions reached in the EISA, and (3) explanation of how conclusions in the EISA and elsewhere in the administrative record disproved plaintiff's assertions. After hearing plaintiff's evidence, and defendant's explanation, we believe that the defendant has carried his burden of proof. We are convinced that the environmental impact of these regulations would not be significant. To explain this conclusion, we proceed to examine the various allegations made by plaintiff.

Plaintiff, in relation to primary harms to the environment resulting from these regulations, made the following allegations:

1. The regulations will increase exports by cooperatives.
2. An increase in exports by cooperatives will require the construction of new port elevator facilities.
3. The regulations will result in an increase in air pollution caused by the handling of grain.
4. The regulations will adversely affect energy use.

Looking first to plaintiff's allegation that the regulation will result in an increase in exports by cooperatives, we note that virtually all of plaintiff's allegations of environmental harm are predicated upon an assumption that the proposed regulation would result in a massive increase in export activity by cooperatives. Thus, plaintiff notes that (1) today cooperatives account for about 7½% of this country's grain exports (255 million bushels), and (2) that the economic impact statement predicts that by 1981, 6% of the wheat and feed grain in the United States will be under loan by cooperatives. Plaintiff apparently predicts that in 1981 cooperatives will export 504 million bushels of grain, which will allegedly be more than cooperative export facilities can handle.

We do not credit plaintiff's calculations. Plaintiff is relying upon figures which relate to the amount of grain to be *under loan,* not the amount of grain to be exported. Plaintiff has presented no evidence challenging the defendant's conclusion, quoted above, that the program is not likely "to allow the cooperatives to materially strengthen their position in international trade." Plaintiff falsely assumes that all of the grain placed in pools will be exported. As the "Analysis" pointed out, the grain in pools would, no doubt, serve both domestic and foreign markets. Thus, while we agree that the regulations will result in some increase in export activity by cooperatives, we cannot accept plaintiff's unproven assumption that all grain placed under loan by the cooperatives will be exported. While the control of a large pool will, no doubt, increase the market power and flexibility of cooperatives, the creation of a pool does not, in and of itself, create a new export market for all the grain contained therein.

Next we turn to plaintiff's argument that the regulations will require construction of new port elevator facilities with concomitant environmental damage to the waterways upon which they are built and the surrounding areas. This argument ignores some basic facts about grain exporting. Plaintiff's own post-trial brief cites figures indicating that in 1974, this country exported 3.36 billion bushels of grain. U.S.D.A., Improving the Export Capability of Grain Cooperatives 60 (1976) (PX # 28) Of this amount, regional cooperatives handled 870

million bushels. Of that total, 38% was exported through private export elevators. Thus, 62% was sold through cooperative export elevators. Of the 62% (536 million bushels), about 255 million bushels were exported directly by cooperatives. The rest, was sold by private companies, even though it was handled through cooperative export facilities. This illustrates the fact that cooperative port facilities have a capacity greater than the market for grain which cooperatives have developed. Thus, presently private grain companies will buy grain from the cooperatives and market that grain through the export facilities of the cooperative.

Statistics thus indicate that while cooperatives had 7½% of the exports, in 1974 they had 17% of the export facilities. (PX # 28, p. 55) And after the 17% figure was compiled, the cooperatives have added even more export facilities. (Plaintiff's Post-Trial Brief, p. 46) Thus, even if plaintiff's inflated figure of 15% of the exports being by cooperatives came to pass, the cooperatives already have facilities sufficient to handle that increase.

Even if an increase in exports required additional facilities for cooperative use, plaintiff's witness admitted that the logical step for cooperatives to take would be the purchase or lease of existing export facilities from private companies. (Tr. 503) This is a widespread practice among exporting companies and would be the cost-efficient method of expansion. (Tr. 505) Plaintiff's environmental expert admitted that existing export facilities were adequate (Tr. 513), and that a shifting of the export business away from the private companies to the cooperatives, if such did occur, would not require additional construction. (Tr. 507)

Plaintiff's next environmental argument is that increased export activity by cooperatives will cause increased air pollution. Again, the testimony of plaintiff's own witness leads us to reject plaintiff's contention. That witness admitted that the challenged regulations would not lead to an increase in the production of wheat, and that the handling of wheat, no matter who does it, results in some air pollution. (Tr. 507) Thus, when total production remains constant, an increase in export sale versus domestic sale, or an increase in cooperative export versus private export, will not lead to an increase in the amount of air pollution. (Tr. 509, 516) As indicated earlier, these regulations are not expected to result in a significant net increase in exports. At most, they will result in an increased share of the export market going to cooperatives. Since cooperative export facilities already handle much more grain than the co-ops themselves sell, a significant shift from private sales to co-op sales could occur without any change in the handling of wheat.

A further factor militating against plaintiff's argument is the witness' admission that no matter who handles the grain, or where it is handled, stringent E.P.A. regulations will prevent serious air pollution from grain dust. (Tr. 507–508)

Plaintiff's fourth environmental argument is that the regulations in question will adversely affect the nation's energy supply. As we understand it, this argument is based upon two assumptions: (1) farmers attracted to cooperatives by the new regulations will drive past a local private grain dealer to deliver their grain to a distant cooperative; and (2) cooperatives have poor access to railroads for cheap transportation.

We find no evidence to support the first of these assumptions. As will be explained in more detail later, any increase in pooling or in exporting is expected to come from grain that is already going to cooperatives, but is not pooled. No significant switching of business from private elevators to cooperative elevators is expected. If such switching does occur, there is no indication that it will primarily be to co-ops further away from the farmer. (Tr. 620)

As to the second assumption, we note that 93% of cooperative elevator storage facilities are situated on rail lines. U.S. D.A., Grain Marketing Patterns of Local Cooperatives 22 (1975) (PX # 25) More importantly, plaintiff's witness admitted that cooperatives use the same "natural

flow patterns" and energy efficient means of transportation for grain that are used by private grain companies. (Tr. 502) Further, as noted before, cooperatives can drastically increase their exporting without any change whatsoever in their handling of grain merely by exporting the grain at their export facilities themselves rather than selling it to private companies who in turn sell to foreign buyers.

We should not leave the energy issue without noting the conclusion of the economic impact statement that the effect of these regulations might be to lessen the utilization of energy because of the centralization of grain handling in large cooperatives. This conclusion is logical, but statistically unquantified. We give this conclusion little weight.

We conclude that the challenged regulations will have no significant primary impact upon the environment. Therefore, no EIS was required in this situation. Nonetheless, we shall proceed to consider plaintiff's argument that implementation of these regulations would result in adverse socio-economic effects. The alleged socio-economic impacts are primarily related to dislocation resulting from a massive shifting of grain business from private grain dealers to cooperative grain dealers as a consequence of the challenged regulations.

On the face of things, it would appear that there is no reason to expect the regulations to produce a shifting of business from private grain dealers to co-ops. All the regulations do is remove a disincentive to pooling which has resulted from prior regulations which allowed loan supports for farmers who dealt with private dealers, and farmers who dealt with co-ops without pooling, but not farmers who wished to pool. Therefore, plaintiff's socio-economic argument boils down to the assertion that the regulations in question bestow upon cooperatives an economic advantage which will be so significant as to drive many members of the plaintiff class out of business.

This contention is squarely rejected by the administrative record compiled by plaintiff. As noted earlier, the "Analysis" of the regulations concluded that they would not affect the structure of the grain industry. More specifically, the "Analysis" also concluded that

Extensions of CCC loans to cooperatives as an alternative to farmers obtaining the loans direct does not change the debt structure of cooperatives, the total volume of commodity loans required, or basic competitive relationships in the capital market.

Plaintiff disputes this conclusion with an argument premised upon a comparison of lending rates. Relevant to plaintiff's argument are at least four separate interest rates: the rate charged for commercial bank loans to business, the prime rate, the rate charged by the Bank for Cooperatives, and the C.C.C. loan rate. The evidence before the Court indicates that we have listed these loans in what is normally a descending order, that is, normally the rate charged for commercial bank loans to business is the highest rate, and the C.C.C. loan rate is the lowest.

The basis of plaintiff's theory is the comparison of the 6% level of the present C.C.C. rate with the 9% interest rate which it is claimed that private companies are now paying (when required compensating balances are considered). Plaintiff claims that while members of the plaintiff class must pay 9% to finance their stocks of grain, under the challenged regulations, the cooperatives will have to pay only 6%, and that this will result in a massive financial advantage which will eventually drive the private grain companies out of business. Plaintiff's favorite illustration is to compare the cost of financing a 500,000 bushel stock of grain for one year at 6% with the cost of financing the same stock for the same period of time at 9%.

The error of plaintiff's theory should be obvious. Under the new regulations, the C.C.C. loan does not go to the cooperatives; rather, it is passed on to the farmer-producer. Plaintiff is, in effect, comparing the interest rate charged the farmer at one stage of the marketing process (before the farmer sells the grain) to the interest rate

charged the grain elevator at a different stage of the marketing process (after the farmer sells the grain). The important point to remember is that while a grain elevator of any type is merely storing the grain, it has no capital costs and need not borrow money to finance the grain it is holding. Only after the farmer makes the decision to sell the grain need the company obtain funds to finance the grain.

Intervenors' post-trial brief contained an analysis of this subject which we feel is helpful to understanding the issue, and we reprint it here:

(General facts applicable to all wheat)

(1) Sixty percent of all wheat is marketed with plaintiff's class.

(2) Forty percent of all wheat is marketed through cooperatives.

(3) A small percent of the forty percent of that marketed through cooperatives, none of that marketed through plaintiff's class, is pooled pursuant to a marketing agreement.

(Facts applicable to wheat stored in plaintiff's warehouses)

(4) The farmers who market the sixty percent through plaintiffs are, as producers, entitled to CCC (Commodity Credit Corporation) six percent nonrecourse loans.

(5) All of the sixty percent in plaintiff's warehouses, if taken out of CCC loan and sold, is sold to the plaintiff's class where it has been warehoused by the farmer producer.

(6) Until grain under CCC loan is sold to plaintiff's class, and the CCC loan paid, it [the private elevator] has no risk and no obligation except to store, for which prepaid storage for eleven months has been collected.

(7) When the farmer takes it out of loan and sells to plaintiff's class, plaintiffs must then borrow at the commercial rate, on recourse loan, in order to pay for the grain.

(Facts applicable to wheat stored in cooperative warehouses, not in the pool)

(8) The farmers who market the forty percent through cooperatives, not in the pool, are entitled to CCC loans.

(9) All of the forty percent not in the pool, in cooperative warehouses, if taken out of the CCC loan and sold, is sold to the cooperative where it has been warehoused.

(10) Until grain (a part of the forty percent not in the pool) is sold to the cooperative, the cooperative has no risk and no obligation except to store, the cost of storage having been prepaid.

(11) When the farmer-producers take that part of the forty percent not in the pool out of the CCC loan, and sell, the cooperative must then borrow at the cooperative bank loan rate, now 7¾%, (Tr. 920) which is comparable to the commercial rate, for the purpose of paying the purchase price.

(Facts applicable to wheat in cooperative pool if Form G loans available)

(12) For wheat in the pool, the cooperative will obtain a loan and pay the proceeds to the farmer producer who will net the same amount as the farmer who obtains a loan and stores with plaintiff, Item 4, and the same as the non-pooling cooperative member, Item 8. (Tr. 715)

(13) The cooperative where the grain is stored, or a cooperative such as FAR-MAR-CO, pursuant to a pooling agreement, has the right to sell, pledge or mortgage pooled grain when it is taken out of CCC loans, the same rights which the plaintiffs have for grain in plaintiff's warehouses (Item 5) or non-pooled grain in cooperative warehouses (Item 9), after the CCC loans are paid and the grain is purchased.

(14) Until the CCC loan is paid, the cooperative has no risk, the situation being the same as described in paragraphs 6 and 10.

(15) When the CCC loan on pooled grain is paid by the cooperative, it must borrow on recourse notes from the cooperative bank to pay off the CCC loan at rates comparable to commercial rates, a situation comparable to Items 7 and 11.

From a consideration of the foregoing, it would seem established that the borrowing on Form G loans, Item 12, places the cooperative handling the pool in the same position as members of the plaintiff's class with whom grain is stored which is security for CCC loans, Items 4 and 8. *Item 12 may not logically or functionally be considered the same as Items 7 and 11, which is the comparison all of plaintiff's witnesses have made.*

The importance of this analysis is twofold. First, it shows the basic irrelevance of the comparison continually made by plaintiff's witnesses—the 6% C.C.C. loan rate which goes to the farmer versus the 9% commercial rate charged to the private grain dealer. Second, it shows that neither the private grain dealers nor the cooperative grain dealers have any risk or need to finance grain until after they purchase the grain from the farmer. A large percentage of the grain in a local elevator is there for storage, and thus is not being financed by the elevator. (Tr. 108)

Thus, an understanding of the grain business in conjunction with an understanding of how the proposed regulations will operate serves to demonstrate the correctness of the conclusions contained in the economic impact statement. Plaintiff's challenge to those conclusions is based upon an erroneous theory.

Even if it were possible to compare these two interest rates by assuming that somehow some portion of the 6% loan rate accrued to the benefit of the cooperatives, plaintiff still would be ignoring several important points. First, frequently a grain dealer will sell grain as soon as he purchases it and therefore will not need to borrow money to finance the storing of said grain. (Tr. 740–741) Seldom will either a private elevator or a cooperative elevator have to borrow money to keep a certain quantity of grain for an entire year, as was assumed in plaintiff's illustrations at trial.

Second, plaintiff ignores the fact that interest rates vary. While at the present time the C.C.C. loan rate is lower than the rate charged by the Bank for Cooperatives, which is, in turn, slightly lower than the commercial rate, this is not always the case. The relatively significant gap presently between the C.C.C. rate and commercial rates is due to the fact that the annual C.C.C. rate is set during the first quarter of the year, and after it was set in 1977, the commercial rates rose. (Tr. 840) At times in the past the rate charged by the Bank for Cooperatives has been higher than the commercial rate, and the C.C.C. loan rate has been higher than either. While this is usually not the case, this situation could obtain again in the future. (Tr. 805) Plaintiff's theory is predicated upon the assumption that the C.C.C. loan rate will continue in the future to be appreciably lower than the commercial rate. This assumption, in light of past history, cannot be safely made.

Third, in attempting to assess the interest advantage these regulations would bestow upon cooperatives, the proper comparison (if we falsely assumed that the advantage of the 6% C.C.C. loan rate accrued to cooperatives) would not be the difference between the C.C.C. rate and the rate private companies pay, but the difference between the C.C.C. rate and the rate cooperatives presently pay. Cooperatives already have a financial advantage because normally the rate charged by the Bank for Cooperatives is somewhat lower than the going commercial rate charged members of the plaintiff class. Thus, even if the 6% C.C.C. rate applied to cooperatives, the magnitude of the financial advantage bestowed by these regulations would not be as large as claimed by plaintiff. This is so even though we realize that the Bank for Cooperatives cannot supply all the capital needs of the co-ops, especially the regionals.

Our rejection of plaintiff's basic theory does not mean that we believe that absolutely no financial advantage will accrue to cooperatives through the attempted extension of Form G loans. We foresee a possible advantage in two aspects. First, between the time farmers deliver grain to the cooperative and the time the C.C.C. loan is processed and the advance returned to the

farmer, the cooperatives will have possession of the money. This so-called "float" is envisioned by plaintiff as a significant financial advantage. We are convinced that this is not the case. Not only are regulations being considered which would limit the time period in question to 15 days, but the evidence before the Court indicates that in practice the time period will be even shorter. (P.I. Tr. 199–200) We do not envision what plaintiff apparently expects— that cooperatives will take the farmer's advance and deposit it in the bank for 30 to 45 days (collecting interest) before passing it through to the farmer. We do not believe that the producer-members who constitute the cooperatives will allow this to happen. (Tr. 788) Illustrative of this is the fact that it appears that the practice of the Pro-Mark pool will be to credit any interest gained during the "float" period to the credit of the pool for later distribution to the farmers who have entered the pool. (P.I. Tr. 102)

Second, the regulations allow the cooperatives to deduct from the pass-through three items: (1) advance storage charges (about 24 cents per bushel); (2) charges for conditioning or drying grain (estimated at 5 cents per bushel); and (3) certain advance handling charges (about 16 cents per bushel). The advance storage charge is not a financial advantage to the co-op, for the farmer who stores grain with a private grain dealer and secures a C.C.C. loan must also provide for payment of advanced storage charges. Similarly, if any drying or conditioning of grain must be done, the farmer must pay the private dealer for this before obtaining the C.C.C. loan. (Tr. 50, 122, 392) However, the 16 cent handling charge may be a financial benefit to the cooperative, for it appears that this charge will have to be withheld from the advance because there appear no provisions for recapture of such charges from the advance at a later date. (Tr. 157, 423) The 16 cents (maximum estimate) thus goes to the cooperative before it has been completely earned, since the handling charges are not completely earned until the sale of the pool is complete. These handling charges are not collected in a non-pooling situation until *after* the grain is sold by the farmer.

Thus, we do find a financial advantage to the cooperative in that it may retain 16 cents per bushel as a handling charge before earning that charge. However, when we realize that the Pro-Mark pool, the major bone of contention in this litigation, is only 40 million bushels of the 2.6 billion bushels of grain handled by local cooperatives and their line operations annually, it is clear that the financial advantage to the cooperatives is not significant. At most, a relatively small financial advantage will accrue to the co-ops on a very small percentage (about 1½%) of the total grain they handle annually. (Tr. 774) Thus, the total capital requirements of the nation's cooperatives will not be significantly affected by these regulations.

To the extent that there is a small financial advantage to the cooperatives, we do not believe that this can be converted into an incentive which would draw business away from the private grain elevators. Those who are inclined to pool are those who already are predisposed to cooperative concepts. (Tr. 721) Thus, the cooperative officials, accurately we believe, expect any increase in pooling to come from non-pooled grain that is already handled through co-ops. It is not likely that a significant amount of grain will go from private grain companies to cooperative pools. (Tr. 786, P.I. Tr. 204)

Any small financial incentive that might be offered by cooperatives due to these new regulations would be more than offset by other factors which determine where a farmer sells his grain. If the private elevator is closer, or if the manager of the private elevator has the farmer's confidence, or if the farmer is not predisposed to cooperative concepts, then a small financial advantage will not lead him to change his business from a private to a cooperative elevator. (Tr. 720–21, 787, 922)

We thus thoroughly discredit the idea that the regulations will result in an interest advantage which will lead to the de-

struction of private grain companies. Plaintiff has not presented evidence sufficient to convince us that the conclusions of the economic impact statement are inaccurate in this regard.

Aside from the interest differential advantage, plaintiff can allege only three other possible advantages to cooperatives from the Form G regulations. First, plaintiff notes that the loans are non-recourse; that is, if the price of wheat falls below the loan price, the cooperative will simply turn the wheat over to the government and the farmer will keep the loan advance. Thus, it is argued, the "down side" risk is eliminated for the cooperatives. This ignores three facts: (1) farmers presently have the same non-recourse advantage when obtaining C.C.C. loans outside pools; (2) private grain companies are also largely protected from the down side risk themselves by the practice of "hedging" (Tr. 850), and (3) the pool operation is not designed to be a profit producer for the co-ops. (P.I. Tr. 193)

Second, there is an administrative convenience which accrues to the farmer under the new regulations in that if they pool, the co-op handles the paperwork of obtaining the C.C.C. loan. This is not such a significant advantage as to create any incentive for farmers outside the cooperatives to join the pools.

Third, plaintiff alleges that a farmer must pre-pay his storage before obtaining a C.C.C. loan with a private company, whereas under the new regulations he need not pre-pay the storage, but may have the charge deducted from the advance. There are two answers to this. If this is considered by the farmer to be a major factor, he can have arrangements made so that the storage charges can be deducted from the C.C.C. loan even when dealing with private companies. 7 C.F.R. 1421.9(b) (1977). Further, this incentive should be more than offset by the handling charges which are deducted by the cooperative under the Form G loans. If a farmer sells to a private company, he gets the entire loan, minus prepaid storage. He need not pay handling charges (16 cents per bushel) until he later sells the wheat. But under the pool, he loses the handling charge immediately. This is a positive disincentive to pooling.

As a final point, we note that both parties pointed to past experience with similar regulations for other commodities as indicative of what would happen under the challenged regulations. The most convincing evidence before the Court demonstrated that the monopoly effects feared by plaintiff have not come to pass under the other regulations, and probably will not come to pass here. (Tr. 710–713, 813–815)

In conclusion, plaintiff's allegations are not supported by the evidence presented. When one understands how the challenged regulations are to operate in practice, the accuracy of most of the conclusions contained in the economic impact statement is validated. No significant shifting of business from private companies to cooperatives should occur as a result of these regulations. Therefore, the socio-economic impacts which plaintiff has alleged will not occur, and no environmental impact statement was required to evaluate them.

## C) PROCEDURAL ERRORS

In light of the examination of the evidence which we have undertaken relative to potential environmental impacts of the proposed regulations, we deem the procedural errors which plaintiff has attributed to defendant in regard to the preparation of the EISA to be largely irrelevant at this point. Nonetheless we shall briefly examine those contentions.

First, plaintiff alleges that defendant has compiled an inadequate administrative record. Because we feared there was some basis for this contention, we took evidence on the environmental issue, and have explained our findings above. Therefore, this contention should be moot. However, we must now confess that we do not believe that the administrative record was deficient in this regard.

In our earlier examination of the evidence presented, the Court obviously relied significantly upon that portion of the ad-

ministrative record contained in the economic impact statement and the "Analysis". We did not rely solely upon the EISA, and for this reason the EISA might be considered inadequate. But we do not believe this is necessarily the case. It is obvious that the primary impact of these regulations envisioned by plaintiff is economic. Only if the economic effects which plaintiff envisions actually occur are the secondary environmental effects even an arguable cause for concern. We believe that the record before the Court as to economic matters was quite adequate, and the conclusions drawn therefrom accurate. Therefore, the defendant was justified in concluding that the economic effects plaintiff fears will not occur. Given that conclusion, the scant attention paid to environmental effects (dependent upon the non-existent economic effects) is justified.

Second, plaintiff alleges that the defendant failed to follow its own regulations which supposedly required preparation of an environmental impact statement. Plaintiff initially argues that an EIS was required under 7 C.F.R. § 799.4(b)(1) which states that actions which involve set-aside acres programs *normally* require an EIS. Because no set-aside acres program was in effect during promulgation of these regulations (Tr. 553), we reject this argument. After final publication of these regulations, a set-aside program was proposed. Even assuming that other criteria were met, a "programmatic" EIS would clearly have been premature. *Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Further, plaintiff has not even speculated as to what adverse environmental effects might have occurred had a set-aside program been in effect at the time the Secretary intended to implement these regulations. Plaintiff's second basis for arguing that defendant's own regulations required an EIS is 7 C.F.R. § 799.4(b)(3)(i) which states that an EIS may be required if proposed regulations will affect any of twelve listed environmental factors. From our review of the evidence, we believe the defendant to have been correct in concluding that none of those twelve factors would

be affected by the challenged regulations, and therefore also correct in further concluding that no EIS was required.

Third, plaintiff argues that defendant erred procedurally in failing to follow the steps outlined in 7 C.F.R. § 799.4(b)(4) for preparation of a "negative determination". However, a negative determination is to be prepared only if it is determined that § 799.4(b)(1) is applicable, but no significant environmental impact is envisioned. We have already determined that § 799.4(b)(1) is inapplicable because no set-aside acres program was in effect at the time these regulations were promulgated. Therefore, no negative determination was required.

Fourth, plaintiff argues that defendant erred in failing to consult with relevant agencies about the effects of the challenged regulations. Plaintiff suggests that defendant should have consulted with the E.P.A. and the Army Corps of Engineers concerning the promulgated regulations. However, we cannot at this point see any value in requiring defendant to consult with the E.P.A. about an increase in grain dust which plaintiff's expert has stated will not occur, or requiring defendant to consult with the Corps of Engineers about the effects of construction of port facilities which need not be built.

Fifth, plaintiff argues that the EISA was not timely prepared. The testimony indicated that it was prepared only three weeks prior to final publication of the regulations. Certainly, this does not appear consonant with the requirement that such study be made "as early as possible." 7 C.F.R. § 799.2(c)(1). For this reason, we have given this statement special scrutiny and taken the evidence discussed above. Our criticism of the tardiness in this action is only somewhat assuaged by the testimony of defendant's officials that had the EISA study disclosed any serious adverse environmental impacts, the decision to proceed with promulgation of the regulations would have been reconsidered.

Plaintiff's primary complaint as to the tardy preparation of the EISA is that it

came after preparation of the economic impact statement. Thus, plaintiff argues that environmental values were subordinated to economic values, which evades the purpose of the N.E.P.A. We must take exception with plaintiff on this point, for it appears to us that no EISA could have been prepared in this case until after the economic impact statement was finished for the simple reason that all of the alleged environmental and socio-economic effects which plaintiff claims will be caused by the regulations are dependent upon the happening of economic effects. Thus, as discussed above, if certain economic effects do not occur, such as the shifting of the grain business from private dealers to cooperatives, the environmental effects will not occur. Thus, an assessment of environmental factors could not have been made until the economic factors were first assessed. Plaintiff cannot even allege a single adverse environmental impact which might stem from implementation of the challenged regulations that is not dependent upon the occurrence of certain economic impacts.

At any rate, the EISA was completed before the regulations became effective. It concluded that there would be no significant adverse environmental impacts, and the evidence which we have taken supports that conclusion. Nothing would be gained by remanding for further agency proceedings at this point. *See National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir. 1973); and *Duke City Lumber Co. v. Butz,* 382 F.Supp. 362, 374 (D.D.C. 1974).

Thus, although arguably defendant did not strictly follow the proper procedure in preparing the EISA, any errors committed were harmless. We have independently reviewed the record and have evaluated the evidence presented by plaintiff. The government has convinced us that the decision not to file an EIS was a reasonable one. We concur in the defendant's reasoning on the crucial environmental issues.

D) CLEAN AIR ACT

The assertion that defendant did not comply with the Clean Air Act Amend-

ments of 1970, specifically 42 U.S.C. § 1857h–7 [recently changed to 42 U.S.C. § 7609] appeared for the first time in plaintiff's post-trial brief. Our consideration of this argument would require the granting of a motion to amend pursuant to F.R. Civ.P. 15, 28 U.S.C. We do not think such an amendment would be appropriate under either subsection (a) or (b) of Rule 15. There is in the record no evidence demonstrating to the Court that the proposed regulations were not commented upon by the Administrator of the E.P.A., as is allegedly required by 42 U.S.C. § 7609. While we have some doubts as to the matter, a conclusion that there has been a failure to comply with this statutory provision would be mere speculation on our part. Therefore, we deny the motion to amend.

Even if we were to consider the argument of plaintiff, we would be required to reject it. Plaintiff contends that this regulation, because it affects the quality of air, should have been submitted to the Administrator of the E.P.A. by the Secretary for the Administrator's comment. We note first that we have concluded there would be no adverse impact on air quality, and therefore no comment by the Administrator would be required. Further, while the plaintiff alleges that it is the duty of the agency promulgating a regulation to submit that regulation to the E.P.A. Administrator, the case which plaintiff cites for this proposition does not make any such holding. *National Forest Preservation Group v. Butz, supra.* The legislative evidence submitted by intervenors suggests to the contrary. At the confirmation hearings for William Ruckelshaus, Senator Muskie noted that this section "makes you a self-starter, whenever you, unilaterally, see an environmental risk. You are given the responsibility to raise the red flag." *Hearings on the Nomination of William Ruckelshaus as EPA Administrator Before the Senate Public Works Committee,* 91st Cong., 2d Sess. 45–46 (1970). The very case cited by plaintiff held that the agency promulgating regulations should not be penalized by the EPA

Administrator's failure to comment upon proposed action (although it was clear in that case that the Administrator's attention had been called to the proposed action, and such is not clear here). *National Forest Preservation Group v. Butz, supra,* 485 F.2d at 412.

Were the above comments not sufficient to dispose of plaintiff's Clean Air Act contention, we would note further (1) plaintiff does not have standing to bring this action for the same reasons we concluded *supra* that plaintiff had no standing to sue for violations of the N.E.P.A.; and (2) it appears that plaintiff has failed to perform an act which may be prerequisite to this Court's jurisdiction over such a claim—the giving of notice to the EPA Administrator 60 days before the filing of suit. 42 U.S.C. § 1857h–2(b)(2); *Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341, 1370 n. 110 (E.D.Pa.1977).

5. **ARE THE REGULATIONS INVALID BECAUSE OF DEFENDANT'S FILING OF AN ALLEGEDLY INSUFFICIENT ECONOMIC IMPACT STATEMENT?**

Executive Order No. 11821, as amended 39 Fed.Reg. 41501 (1974) and 42 Fed.Reg. 1017 (1976), requires that all major legislative proposals, regulations, and rules emanating from the executive branch of government include a statement certifying that the inflationary impact on the nation has been carefully considered. It is contemplated that such an economic impact statement shall consider such factors as cost impact, effect on productivity, effect on competition, and effect on suppliers of important products or services.

Plaintiff contends that the economic impact statement filed by the defendant was substantively deficient because it inaccurately analyzed the impact of the challenged regulations, and was deficient procedurally because it was belatedly prepared.

The Court does not believe that the plaintiff's contentions in regard to the economic impact statement need be analyzed on their merits, for it appears that Executive Order No. 11821 creates no enforceable rights which accrue to plaintiff.

The general rule appears to be that an executive order may create enforceable rights when such an order is necessary to effectuate the purposes of a statute or regulation. In the absence of such necessity, no such enforceable rights will be found to exist. In *Acevedo v. Nassau County,* 500 F.2d 1078, 1083, 1084 (2d Cir. 1974), the Second Circuit noted in regard to Executive Order 11512 (regarding the availability of low income housing):

Even if appellants could pass the constitutional test of standing, they would still have to show that the Executive Order, regulation, or Memorandum of Understanding were intended to create private rights of action. None of them expressly grants such a right. Of course, such rights may be inferred when necessary to effectuate the purposes of a statute or regulation. See *J. I. Case Co. v. Borak,* 377 U.S. 426, 431–434, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). But where the source of the statute or regulation has been silent, courts do not lightly infer such rights.

The requisite constitutional or statutory basis for an Executive Order was found in *Legal Aid Society of Alameda County v. Brennan,* 381 F.Supp. 125, 129–130 (N.D. Cal.1974), which involved Executive Order 11246 (relating to affirmative action by contractors holding federal contracts):

Defendants' principal contention is that Executive Order 11246 is not mandated by any Act of Congress or the Constitution, which therefore makes all federal agency actions taken pursuant to it discretionary and nonreviewable. On the other hand, executive orders clearly carry the force and effect of law *if they are issued pursuant to constitutional or statutory authority.* This particular executive order and its direct antecedents have consistently been held to be based on statutory authority resting with the President to provide for procurement, utilization, and management of government property. . . . [cites omitted] (emphasis added)

A detailed consideration of the issue of whether Executive Order 11821 creates enforceable private rights was undertaken in the Eighth Circuit's opinion in *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228 (8th Cir. 1975). Overturning a district court ruling to the contrary, the Eighth Circuit found no basis for determining that Executive Order 11821 presented a cause of action for private litigants challenging the promulgation of governmental regulations. We quote from that opinion:

Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress. *See Gnotta v. United States*, 415 F.2d 1271, 1275 (8th Cir. 1969); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n. 1 (5th Cir. 1967); *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3, 7 (3d Cir. 1964). Executive Order No. 11821, issued by the President on November 27, 1974, cites no specific source of authority other than the "Constitution and laws of the United States." [526 F.2d at 234–235]

After analyzing and rejecting the specific statutory provisions which the district court had held authorized Executive Order 11821, the Eighth Circuit concluded:

. . . in our view, Executive Order No. 11821 was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action. *See Kuhl v. Hampton*, 451 F.2d 340, 342 (8th Cir. 1971) (per curiam); *Manhattan-Bronx Postal Union v. Gronouski*, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965). Even if appellees could show that the Order has the force and effect of law, they would still have to demonstrate that it was intended to create a private right of action. *See Acevedo v. Nassau County*, 500 F.2d 1078, 1083–84 (2d Cir. 1974); *Kuhl v. Hampton, supra*, 451 F.2d at 342; *Farkas v. Texas Instrument, Inc., supra* 375 F.2d at 632–33; *Farmer v. Philadelphia Electric Co., supra* 329 F.2d at 9; *see also Gnotta v. United States, supra*, 415 F.2d at 1275. Executive Order No. 11821 does not ex-

pressly grant such a right. To infer a private right of action here creates a serious risk that a series of protracted lawsuits brought by persons with little at stake would paralyze the rulemaking functions of federal administrative agencies. [526 F.2d at 235–236]

The Eighth Circuit later reaffirmed this ruling in *National Renderers Ass'n v. E.P.A.*, 541 F.2d 1281, 1291–1292 (8th Cir. 1976). *See also American Medical Ass'n v. Mathews, supra*, 429 F.Supp. at 1214.

■ We therefore conclude that Executive Order 11821 provides no basis for a ruling on our part which would invalidate the promulgation and implementation of the challenged regulations.

6. ARE THE REGULATIONS INVALID BECAUSE THEY PROMOTE VIOLATIONS OF

a) the Commodity Exchange Act;

b) the Sherman Act and the Capper-Volstead Act; and

c) 15 U.S.C. § 713a–13?

## A) COMMODITIES ACTS

It is plaintiff's argument that the action by the Secretary must be overturned by the Court on the ground that it promotes violations of the Commodity Exchange Act. Specifically, it appears to be the thrust of plaintiff's contention that:

If cooperatives could command a controlling position in either the cash or futures markets, they would be *in a position* to "squeeze" or "corner" the market in clear violation of the antimanipulative provisions of the Commodity Exchange Act, 7 U.S.C. § 13. [Suggestions in Support of Plaintiff's Motion for a Preliminary Injunction, p. 23] (emphasis added)

Thus, plaintiff argues that the proposed regulations will cause a shifting of grain marketing business away from the independent dealers to the cooperatives who will be able to amass large quantities of grain, thus "cornering" the market. Plaintiff alleges that this puts the cooperatives *in a position*

to attempt to violate 7 U.S.C. § 13 insofar as that statute prohibits manipulation of the price of commodities in interstate commerce.

7 U.S.C. § 13 sets forth criminal penalties for certain violations of the commodities laws. Subsection (b) of 7 U.S.C. § 13 states, in pertinent part:

It shall be a felony punishable by a fine of not more than $100,000 or imprisonment for not more than five years, or both, together with the costs of prosecution, for any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity,

. . . .

7 U.S.C. § 13a–1 allows the Commodities Exchange Commission, whenever it appears to the Commission that an entity is engaging in violations of the applicable rules and regulations, to bring an action seeking injunctive relief in the proper district court of the United States.

7 U.S.C. § 13b sets forth the powers of the Commission to issue cease and desist orders to any person manipulating or attempting to manipulate the commodities markets.

We believe that the short answer to plaintiff's argument is that the acts which plaintiff argues these regulations would place the cooperatives *in a position* to commit, constitute felonies. Even if we assume arguendo that a shifting of the grain trade would occur, we still have no reason to believe that the cooperatives will commit violations of the law just because they are placed in a position to do so. We do not choose to accept plaintiff's speculation in this regard, nor to further speculate that the relevant agencies would not enforce the laws in this regard. The Commodities Exchange Commission is endowed with a raft of powers with which it can prevent or halt the manipulative activities which plaintiff alleges might occur were the challenged regulations implemented.

In addition, as noted above, the evidence indicates that no such shifting of the grain handling business away from independents to cooperatives will occur. If that is the case, these regulations do not place the cooperatives in a better position than they are in today to violate the law. No evidence indicates that similar programs in other commodities have disrupted the trading of these grains. (Tr. 813)

In summary, plaintiff asks us to accept three assumptions: (1) that the regulations will result in a shifting of the grain marketing business away from independent dealers to cooperatives; (2) that the cooperatives will utilize their increased stocks of grain to violate the law; and (3) that the relevant administrative agencies will not act to stop such violations. We cannot accept any of the three assumptions and therefore cannot accept plaintiff's argument.

## B) ANTITRUST LAWS

Plaintiff strenuously argues that the implementation of the proposed regulations will have anticompetitive effects. Plaintiff contends that the regulations will shift grain marketing business away from the independent grain dealers and to the cooperatives and that this will result in increased economic power for the cooperatives. Plaintiff argues that we should enjoin implementation of these regulations because the cooperatives are likely to use this economic power to violate the antitrust laws of the United States.

In specific terms, plaintiff apparently fears that the regulations will allow the cooperatives to violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Capper-Volstead Act, 7 U.S.C. § 292.

Section 1 of the Sherman Act declares illegal contracts, combinations and conspiracies in restraint of trade or commerce. Section 2 of the Capper-Volstead Act allows the Secretary of Agriculture to issue cease and desist orders (and secure other relief) when he has reason to believe that cooperative marketing associations are monopolizing or restraining trade in interstate com-

merce to an extent that "the price of any agricultural product is unduly enhanced by reason thereof, . . . "

Defendant points to certain antitrust exemptions that pertain to cooperative marketing associations. Section 1 of the Capper-Volstead Act, 7 U.S.C. § 291 authorizes persons engaged in the production of agricultural products to act together in associations while marketing so long as certain conditions are met. Section 6 of the Clayton Act, 15 U.S.C. § 17, states that nothing in the antitrust laws shall be construed to forbid the existence of agricultural organizations instituted for the purposes of mutual help (so long as certain conditions are met), and further provides that such organizations shall not be construed to be illegal combinations or conspiracies in restraint of trade.

In response, plaintiff accurately points out that the antitrust immunity accorded cooperatives is limited. In *United States v. Borden*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939), the Supreme Court held that the Capper-Volstead Act, while authorizing the formation and existence of cooperatives, did not authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise. In *Maryland and Virginia Milk Producers Assn. v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), the Supreme Court again held that cooperatives were subject to antitrust enforcement where they joined with unprotected persons in violation of the antitrust laws. Together, these two opinions discussed Sections 1–3 of the Sherman Act, and Section 7 of the Clayton Act. In *Maryland and Virginia Milk Producers Assn. v. United States, supra*, 362 U.S. at 464–466, 80 S.Ct. at 852, the Supreme Court noted, relative to § 6 of the Clayton Act, that:

> This Court has held that the provisions of that section [15 U.S.C. § 17], relating to labor unions do not manifest "a congressional purpose wholly to exempt" them from the antitrust laws, and neither the language nor the legislative history of the section indicates a congressional pur-

pose to grant any broader immunity to agricultural cooperatives . . . . Thus, the full effect of § 6 is that a group of farmers acting together as a single entity in an association cannot be restrained "from lawfully carrying out *the legitimate objects* thereof" (emphasis supplied), but the section cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will.

In that same case, the Supreme Court also spoke to the scope of the antitrust exemption set forth in the Capper-Volstead Act, 7 U.S.C. § 292, 401 U.S. 437 at 466–467, 91 S.Ct. 828, 28 L.Ed.2d 168:

> This [House Report on the Capper-Volstead Act] indicates a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws. It does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way.

See also *United States v. National Broiler Marketing Ass'n*, 550 F.2d 1380, 1384 n. 7 (5th Cir. 1977)

We can easily accept plaintiff's proposition that the antitrust exemption for cooperatives is limited. Because of this, our reaction to plaintiff's antitrust argument is similar to our reaction to plaintiff's commodities argument. Again plaintiff asks us to assume three things. First, we are asked to assume that the regulations will result in a dramatic shift of activity in the grain marketing industry. This is unsupported by the evidence. Second, plaintiff asks us to assume that given increased economic power, the cooperatives will run amok, violating antitrust laws with reckless abandon. Third, plaintiff asks us to assume that the appropriate authorities will not act to enforce the antitrust laws. We refuse to accept these assumptions.

In effect, plaintiff is asking the Court for an advisory opinion that the regulations may result in certain conduct which would, if it occurred, constitute a violation of the antitrust laws. This is speculation in which, absent a concrete case or controversy, we need not engage.

To this point, we have assumed that the antitrust problems which plaintiff foresees will stem from possible *private* activity by the cooperatives after implementation of the new regulations. To the extent plaintiff's argument is that the very implementation of these regulations (*i. e., governmental* action) causes an antitrust violation, plaintiff's claim is blocked by the fact that the antitrust statutes are not meant to affect governmental activity. In *United States v. Rock Royal Co-op, supra,* 307 U.S. at 560, 59 S.Ct. at 1006, the Supreme Court held that if the Secretary of Agriculture issued otherwise valid orders, "the fact that their effect would be to give cooperatives a monopoly of the market would not violate the Sherman Act." In a later case the Supreme Court noted:

. . . where a restraint upon trade or monopolization is the result of valid government action, as opposed to private action, no violation of the [Sherman] Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution. [*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961)]

This principle of law has been applied in a case in which the Court thought it worth noting that the beneficiary of the allegedly anticompetitive government action was a rural electric *cooperative. Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672, 677 (5th Cir.), *reh. denied,* 397 F.2d 809, *cert. denied* 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968). This principle

has also been specifically applied to price support activities of the Secretary of Agriculture. *Stroud v. Benson,* 155 F.Supp. 482, 492–493 (E.D.N.C. 1957), *vacated on other grounds,* 254 F.2d 448 (4th Cir.), *cert. denied,* 358 U.S. 817, 79 S.Ct. 28, 3 L.Ed.2d 59 (1958).

Plaintiff's reliance upon *United States v. The Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) is distinguishable for the reason, *inter alia,* that the Court expressly refused to reach the Sherman Act question presented. 374 U.S. at 324, 83 S.Ct. 1715. Thus, that case was decided solely upon 15 U.S.C. § 18 governing acquisition of stock of one corporation by another—a statute not relevant in this case.

Plaintiff also relies on cases which indicate that agencies must consider anticompetitive effects when taking important actions. *Gulf States Utilities Co. v. F.P.C.,* 411 U.S. 747, 758–760, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); *Denver and Rio Grande Western R.R. Co. v. United States,* 387 U.S. 485, 492–498, 87 S.Ct. 1746, 18 L.Ed.2d 954 (1967); *Sabin v. Butz, supra,* 515 F.2d at 1069. We agree with the holding of these cases. The proper light in which to consider this question is spelled out in detail in *Sabin v. Butz, supra* at 1069–1070:

The Government's only argument addressed to antitrust considerations is that valid governmental action may not constitute an antitrust violation, citing *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642; *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; *Howard v. State Department of Highways of Colorado,* 478 F.2d 581 (10th Cir.). The antitrust claim as presented in *Heath v. Aspen Skiing Corp.,* 325 F.Supp. 223 (D.Colo.), was rejected on this basis. However, we cannot agree that this proposition is an answer to the problem as presented in this case, or that it supports the summary judgment entered. We are not considering whether particular violations of the antitrust laws were involved—a question the agency would not

decide definitively. See *McLean Trucking Co. v. United States*, 321 U.S. 67, 79–80, 64 S.Ct. 370, 88 L.Ed. 544. We are concerned instead with whether there was arbitrary agency action by failure to take into account broader considerations of anti-competitive factors. *Gulf States Co. v. FPC*, 411 U.S. 747, 759–60, 93 S.Ct. 1870, 36 L.Ed.2d 635.

We are satisfied that the record made with the summary judgment motion did not demonstrate consideration of the monopoly and anti-competitive factors by the agency. See *Overseas Media Corp. v. McNamara*, 128 U.S.App.D.C. 48, 385 F.2d 308, 313–14, 318. Therefore we hold that the summary judgment must be vacated and the case remanded on the issue whether the administrative actions were arbitrary, capricious or an abuse of discretion. If further proceedings demonstrate fair consideration of all relevant factors by the agency, the only function of the court would be to decide if the agency action had a rational basis. See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416–21, 91 S.Ct. 814, 28 L.Ed.2d 136. If the Court concludes that the defendants failed to consider all relevant factors, the case should be remanded to the Secretary for reconsideration. See *Denver & Rio Grande Western R. R. Co. v. United States*, 387 U.S. 485, 507, 87 S.Ct. 1754, 18 L.Ed.2d 905; *Michigan Consolidated Gas Co. v. FPC*, 108 U.S.App.D.C. 409, 283 F.2d 204, 226, cert. denied sub nom. *Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co.*, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227.

The procedure outlined in *Sabin v. Butz* was followed here. The potentially anticompetitive features of the proposed regulations were considered by the defendant. These features and the defendant's consideration of them appear in the administrative record. As we have discussed in relation to the environmental impact issue, the evidence supports the conclusion that the anticompetitive impacts which plaintiff fears will not occur. This was also the conclusion of the Antitrust Division of the Department of Justice which refused to oppose these regulations because it did not appear that they would lead to anticompetitive activity.

■ We conclude that plaintiff's contentions relative to the antitrust issue are meritless and do not present any basis for overturning the actions of the Secretary of Agriculture.

## C) 15 U.S.C. § 713a–13

As yet another ground for invalidating the proposed regulations, plaintiff argues that their promulgation and implementation violates the policy of Congress set forth in 15 U.S.C. § 713a–13. That statute reads as follows:

> Congress hereby reconfirms its longstanding policy of favoring the use by governmental agencies of the usual and customary channels, facilities, and arrangements of trade and commerce, and directs the Secretary of Agriculture and the Commodity Credit Corporation to the maximum extent practicable to adopt policies and procedures designed to minimize the acquisition of stocks by the Commodity Credit Corporation, to encourage orderly marketing of farm commodities through private competitive trade channels, both cooperative and noncooperative, and to obtain maximum returns in the marketplace for producers and for the Commodity Credit Corporation.

■ Plaintiff reads the phrase "to encourage orderly marketing of farm commodities through private competitive trade channels, both cooperative and noncooperative" as being an absolute prohibition against any action which would favor cooperative over noncooperative trade channels. We cannot accept plaintiff's interpretation of this statute, and find the analysis of the defendant and intervenors persuasive.

By simply examining the plain wording of the statute one may easily conclude that this statute does not set forth a single, overriding policy which prohibits favoring cooperative over noncooperative trade chan-

nels. Obviously, the statute sets forth three goals: (1) minimization of acquisition of stocks by the Commodity Credit Corporation, (2) encouragement of orderly marketing of farm commodities, and (3) maximization of returns in the marketplace for producers and for the Commodity Credit Corporation. Nowhere does the statute clearly set forth the meaning which plaintiff would ascribe to it—that all policies and programs of the Department of Agriculture must treat cooperatives and independents equally.

We read the phrase in question as merely reemphasizing the goal of Congress that existing marketing channels be used, and not replaced by governmental facilities. While we find no cases interpreting 15 U.S.C. § 713a–13, similar phrasing appears in both 15 U.S.C. § 714b and § 714c, which statutes set forth the general and specific powers of the Commodity Credit Corporation. 15 U.S.C. § 714b(h) states, in part:

> And provided further, that nothing contained in this subsection shall limit the duty of the Corporation, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, to utilize the *usual and customary channels,* facilities, and arrangements of trade and commerce in the warehousing of commodities: . . .
> (emphasis added)

15 U.S.C. § 714c states, in its last paragraph:

> In the Corporation's purchasing and selling operations with respect to agricultural commodities (except sales to other Government agencies), and in the warehousing, transporting, processing, or handling of agricultural commodities, the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and effective and efficient conduct of its business, utilize the *usual and customary channels,* facilities, and arrangements of trade and commerce.

The meaning of these phrases has been discussed in case law. In *Worthington v. Commodity Credit Corporation,* 157 F.Supp. 497, 502 (E.D.N.C.1957), *rev'd on other grounds,* 263 F.2d 178 (4th Cir. 1959), the Court interpreted § 714c as follows:

> In view of the above, it appears to the Court that possibly the policy established by Sec. 714c is to insure that it be the policy of the defendant corporation to use usual and customary trade facilities, the use of which is both quantitatively and qualitatively consistent with the corporation's purposes and efficient operation, to the maximum extent *rather than* use unusual facilities which would compete with private enterprise (where such constituted the usual facilities) and constitute a wasteful expenditure.

We view the 1962 statement contained in 15 U.S.C. § 713a–13 as merely a reaffirmation of the Congressional statement of policy from 1948 which contained, in part, a purpose to avoid replacing private enterprise (both cooperative and noncooperative) with governmental facilities.

The rigid interpretation which plaintiffs place upon § 713a–13 is belied by the legislative history of the statute. Conference Report No. 2385, the Statement of Managers on the Part of the House relative to the Food and Agriculture Act of 1962, contained at 1962 U.S.Code Cong. and Adm. News, pp. 2662, 2700 indicates the flexibility which was built into § 713a–13:

> The directive to the Secretary and Commodity Credit Corporation in Section 402 [§ 713a–13 of Title 15] to adopt certain policies and procedures is by its terms to be carried out "to the maximum extent practicable." In determining whether the extent to which the adoption of such policies and procedures is practicable, it is intended that the Secretary and Commodity Credit Corporation have *wide latitude for the exercise of discretion.* In exercising such discretion, it is of course contemplated that there will be taken into consideration, among other factors, whether the policy or procedure would be consistent with the fulfillment of the Corporation's purposes and with the efficient and effective conduct of its

operations. Section 402 is not intended in any way to override other statutory provisions which apply to the Secretary and Commodity Credit Corporation in carrying out their activities and responsibilities. (emphasis added)

■ Thus, even if we were to read the language of § 713a–13 as indicating that noncooperatives should be treated equally with cooperatives (which we do not), the defendant still has great discretion in attempting to achieve this goal. This goal is only one of many which defendant has been directed by Congress to achieve. We have already discussed some of the goals which defendant is attempting to achieve by the promulgation of the challenged regulations, e. g., equity in the price support program, promotion of exports. The proposed regulations constitute a reasonable balancing of the various duties and responsibilities of the defendant. There is no basis in 15 U.S.C. § 713a–13 for invalidating defendant's actions.

7. ARE THE REGULATIONS UNCONSTITUTIONAL BECAUSE THEY DEPRIVE THE PLAINTIFF CLASS OF DUE PROCESS AND EQUAL PROTECTION?

A) DUE PROCESS

Plaintiff first argues that the regulations will drive the plaintiff class out of business, and that this deprivation of the right to do business constitutes a constructive taking of property without just compensation in violation of the Due Process Clause of the Fifth Amendment.

We accept plaintiff's assumption that the Secretary's actions in implementing price support programs are subject to the restrictions of the Due Process Clause of the Fifth Amendment. *Secretary of Agriculture v. Central Roig Refining Company,* 338 U.S. 604, 616, 70 S.Ct. 403, 94 L.Ed. 381 (1950), *United States v. Hawes,* 529 F.2d 472, 477 (5th Cir. 1976).

■ We reject this contention for two reasons. First, we have already noted that the defendant's goal of assisting farmers is a proper goal, and that these regulations constitute a reasonable step toward the achievement of that goal.

Second, as we have also already noted, the evidence convinces us that the plaintiff class will not be driven out of business as plaintiff alleges. As the Supreme Court noted in *Secretary of Agriculture v. Central Roig Refining Company, supra,* 338 U.S. at 619, 70 S.Ct. at 411:

It is not for us to have views on the merits of this legislation. It suffices that we cannot say, as we cannot, that there is "discrimination of such an injurious character as to bring into operation the due process clause." *Currin v. Wallace,* 306 U.S. 1, 14, 59 S.Ct. 379, 83 L.Ed. 441.

B) EQUAL PROTECTION

Plaintiff next argues that the regulations distinguish between cooperatives and private elevators, and that the discrimination between the two is so unjustifiable as to violate the concept of equal protection as incorporated into the due process clause of the Fifth Amendment.

■ We also reject this argument. We have already noted that a prime purpose of these regulations is to *eliminate* discrimination which exists when farmers who wish to pool in certain commodities cannot obtain price support loans when farmers who do not pool and farmers who pool in other commodities can obtain the benefit of those loans. (Tr. 770)

■ Plaintiff complains because the new regulations do not aid all farmers, but only those who wish to pool. The support of farm income is a reasonable goal for the defendant to undertake to achieve, and we shall not overturn his efforts in that regard simply because his program does not aid all farmers. Many problems must be attacked piecemeal, and it is not a denial of equal protection that defendant does not aid all those who need aid with every program he promulgates. Few programs would ever be adopted if they were required to aid all who needed assistance equally. *Ray Ballie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696,

704–705 (5th Cir. 1973), *reh. denied,* 478 F.2d 1403, *cert. denied* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974).

Plaintiff argues that private grain dealers and cooperatives are identical corporate entities, and therefore any difference in treatment of them is unjustifiable discrimination. As we have already noted, this is not the case. Cooperatives are a unique corporate organizational form. Cooperatives arguably operate for the benefit of their members—the farmers; they do not operate for the benefit of stockholders.

An agricultural cooperative is a business organization, usually incorporated, owned and controlled by member agricultural producers, which operates for the mutual benefit of its members or stockholders, as producers or patrons, on a cost basis after allowing for the expenses of operation and maintenance and any other authorized deductions for expansion and necessary reserves. [U.S.D.A. Legal Phases of Farmer Cooperatives 3 (1976) (PX # 29), citing Evans and Stokdyk, The Law of Agricultural Cooperative Marketing (1937).]

The perceived distinctions between cooperatives and other forms of business organization have been repeatedly recognized by Congress. As a result, Congress has passed a long list of legislation favorable to cooperatives. Listings of examples of such legislation appear at pages 11–12 of defendant's "Opposition to Plaintiff's Motion for a Preliminary Injunction," (Doc. # 28), and at pages 9–10 of the "Post Trial Brief of Amicus Curiae, National Council of Farmer Cooperatives" (Doc. # 117). Some of these examples would be 7 U.S.C. § 207(f) (Patronage refunds made by co-ops are not rebates forbidden by the Packers and Stockyards Act of 1921); 7 U.S.C. § 1507(e) (Federal Crop Insurance Board authorized to use co-ops to carry out its responsibilities); 7 U.S.C. § 10a (cooperatives not to be excluded from boards of trade); 15 U.S.C. § 77c(5) (farmer co-ops exempted from Securities Act of 1933); and 26 U.S.C. § 521 (special tax treatment for co-ops). We have already taken note of 12 U.S.C. § 1141, which states:

(a) It is declared to be the policy of Congress to promote the effective merchandising of agricultural commodities in interstate and foreign commerce so that the industry of agriculture will be placed on a basis of economic equality with other industries, and to that end to protect, control, and stabilize the currents of interstate and foreign commerce in the marketing of agricultural commodities and their food products—

. . . . .

(3) by encouraging the organization of producers into effective associations or corporations under their own control for greater unity of effort in marketing and by promoting the establishment and financing of a farm marketing system of producer-owned and producer-controlled cooperative associations and other agencies.

This special treatment which has been accorded cooperatives has been sanctioned by the United States Supreme Court in *United States v. Rock Royal Co-op, supra,* 307 U.S. at 563, 59 S.Ct. at 1007:

The general characteristics of cooperatives are well understood. The Capper-Volstead Act defines such cooperatives as associations of producers, corporate or otherwise, with or without capital stock, marketing their product for the mutual benefit of the members as producers with equal voting privileges, restricted dividends on capital employed and dealings limited to 50 percent non-member products. Different treatment has been accorded marketing cooperatives by state and Federal legislation alike. Indeed, the Secretary is charged by this Act to "accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution." These agricultural cooperatives are the means by which farmers and stockmen enter into the process-

**510**

ing and distribution of their crops and livestock. *The distinctions between such cooperatives and business organizations have repeatedly been held to justify different treatment.* (emphasis added)

██ It therefore appears to be clear that even if we changed our conclusion that the challenged regulations do not materially aid the competitive position of cooperatives vis-a-vis the plaintiff class, we would still be unable to find a violation of equal protection, for we would not be able to find any irrational or unjustified discrimination. A program which aids cooperatives without aiding private grain dealers does not necessarily violate equal protection or due process concepts. Nor is an action arbitrary and capricious merely because it favor cooperatives. Congress has repeatedly acted to benefit cooperatives, and this Court cannot overturn otherwise legitimate actions by the Secretary merely because he has chosen to do the same.

## IV. CONCLUSION

The Court is prepared to render judgment for defendant after examining and rejecting all of the major arguments posited by plaintiff. Just as defendant is not required to answer individually each of the 7000 comments made upon the proposed regulations, we do not feel constrained to detail in the opinion answers to each and every supporting argument lodged by plaintiff in over 300 pages of excellent briefs relating to the merits of this action. Nonetheless, those arguments have been considered. Usually they have been rejected for the reasons stated in the comprehensive briefs filed by defendant or intervenors.

By this opinion, the Court does not endorse the action taken by the Secretary. It is not for this Court to decide whether the course taken by the Secretary was the proper one, or whether a better course of action was available. We shall not substitute our judgment for that of the Secretary. The decisions challenged herein are within the discretion of the Secretary. They are his decisions and his alone.

What we have done is examine the administrative record. We have concluded that the record was adequate to demonstrate that the actions of the Secretary were not arbitrary and capricious. We have determined that plaintiff has no right to challenge the alleged insufficiency of the Economic Impact Statement. We have similarly rejected plaintiff's standing to challenge the defendant's failure to file an environmental impact statement. In addition, we have examined the evidence submitted by counsel, and have determined that no adverse environmental effects within the meaning of the N.E.P.A. are likely to stem from the implementation of these regulations, and that no due process or equal protection violations will occur.

The Court cannot be certain of all of the ramifications of the challenged regulations. However, we are convinced that the regulations do not grant staggering financial advantages to cooperatives. We are further convinced that co-op pooling is not a marketing device with such charismatic appeal that elimination of the present disincentive to pooling (denial of price support loans) will lead to a great shifting of business away from the private grain dealers. The Secretary cannot be faulted for his decision to use Form G loans to boost the farm sector generally, or the pooling concept in particular.

This Court is committed to requiring the agencies of government to follow proper rules and guidelines set forth by both Congress and the Constitution. We intend to enforce the requirements of the N.E.P.A., the A.P.A., and the Fifth Amendment. However, we do not wish to make the process of governing impossible. We recognize that plaintiff, with a perceived economic interest in opposing the challenged regulations, is utilizing every tool at its command to attempt to thwart the decision of the Secretary. Plaintiff has gone so far as to divide an assumed number of arguments to be discussed into the time spent at a certain meeting in an attempt to have the Court conclude that the time-per-argument ratio was such that the defendant could not have given the arguments adequate considera-

tion. Plaintiff's Reply Post-Trial Brief, p. 7 (Doc. # 122). Were the Court to accept this argument, and a number of others plaintiff has urged upon us, and scrutinize the defendant's decision-making process with an electron microscope, we believe the Department of Agriculture would be placed in a position where very little of substance could be accomplished.

IT IS THEREFORE ORDERED that plaintiff's requests for relief be denied, that all claims be resolved in defendant's favor, that this action be dismissed, and that judgment be entered in defendant's favor.